**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Richard L. SWIHART,
Defendant-Appellee.**

No. 76–2357.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 2, 1977.
Decided April 27, 1977.

Frederick M. Coleman, U. S. Atty., James D. Jensen, Toledo, Ohio, for plaintiff-appellant.

Harland M. Britz, Britz & Zemmelman, Toledo, Ohio (Court-appointed), for defendant-appellee.

Before PHILLIPS, Chief Judge, and WEICK and EDWARDS, Circuit Judges.

WEICK, Circuit Judge.

The Government has appealed from an order of the District Court granting appellee Swihart's motion to suppress evidence seized pursuant to a search warrant issued by a United States Magistrate. The evidence suppressed was a large quantity of Dupont smokeless gun powder. Its seizure resulted in an indictment charging Swihart in six separate counts of a twenty-six count indictment, which indictment also charged three other persons with similar offenses. Swihart was charged with transporting and receiving stolen ammunition moving in interstate commerce, in violation of 18 U.S.C. §§ 922(i), 922(j), and 924(a), and with failing to maintain required records, in violation of 18 U.S.C. §§ 922(m) and 924(a).

The sole issue on this appeal is whether the affidavit upon which the search warrant was issued was defective because it allegedly failed to state facts from which

the affiant, Special Agent Louis M. Halkias of the Bureau of Alcohol, Tobacco and Firearms of the Treasury Department, and also the magistrate to whom the affidavit for the search warrant was submitted, could conclude that the informant, Mr. Paul E. Davis, was " 'credible' or his information 'reliable'." *Aguilar v. Texas*, 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The District Court, in granting the motion to suppress, held that the affidavit was defective. We reverse.

The affidavit for the search warrant,[1] sworn to by Agent Halkias, stated that on February 26, 1976 he received a telephone call from Paul Davis, president and owner of Davis Explosives Company located in Findlay, Ohio. Davis told Agent Halkias that he, with the help of his (Davis') secretary, checked his inventory, and that the check revealed that there was missing about 800 pounds of gun powder which he had stored in his magazine, and, in particular, a 20-pound keg of Dupont IMR, 30–31 smokeless gun powder, Lot number P76JA09B–1353, which keg Davis knew that he had had the previous day.

Davis stated that he remembered that earlier in the week he had received a telephone call from a Mr. Swihart who had a gun store in Fostoria, Ohio, in which call Swihart asked Davis about the price, quantity, and availability of Dupont gun powder.

Swihart also told Davis that he was sorry that he had not bought some gun powder which an individual had once offered him at a price so "ridiculous" that he thought the powder was stolen. He further informed Davis that he planned to travel to Georgia to "split a ton of powder" with some friends.

■ Davis told Agent Halkias that on February 27, 1976 [2] he went to see Swihart's gun store because he (Davis) knew all of his own customers and therefore he was curious as to how it happened that he was not aware of a gun dealer (Swihart), located only fifteen miles away, who sold a large amount of smokeless gun powder. In Swihart's store, while waiting to be served, Davis observed various kegs and boxes of Dupont smokeless gun powder, a quantity which he estimated to Agent Halkias to be about 300 to 500 pounds. He saw in a small adjoining room a 20-pound keg of Dupont IMR, 30–31 smokeless gun powder and he wrote down the lot number of the powder, P76JA09B–1353, which lot number was identical with the lot number of his missing keg.[3] Swihart told Davis, who posed as a regular customer, that he got a "deal" on the 20-pound keg of Dupont 30–31 smokeless gun powder, and that he would sell it to Davis for $65.00, plus tax. Davis indicated to Swihart that he would consider the price; he then left the store and notified Sheriff

---

1. The entire text of the affidavit and the sworn statement of the informant Paul E. Davis, are appended hereto as Exhibits "A" and "B" respectively.

2. There is an inconsistency at this point in the affidavit because Davis' telephone conversation with Agent Halkias of February 26th could not have described Davis' visit to Swihart's gun shop on February 27th. It is clear that the telephone conversation between Davis and Agent Halkias must have taken place on February 27th, as appears from the attached copy of Davis' affidavit. This inconsistency, however, is not material, and, contrary to the implication made by the District Court, it does not show an absence from the affidavit of underlying circumstances from which the magistrate could conclude that the informant was credible or that his information was reliable. Indeed, "such a construction of the affidavit is the very sort of hypertechnicality"

which the Supreme Court condemned in *United States v. Harris*, 403 U.S. 573, 579, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), and in *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

3. The District Court stated that Davis' statements with respect to the lot number were "inconsistent" because it was not until after Davis had left Swihart's store, and after he had taken another inventory with the local sheriff that he discovered that the lot number of his missing keg and that of the keg in Swihart's store were identical. We find no inconsistency in Davis' statements, and find it quite credible that although Davis had recorded the lot number of his missing keg before visiting Swihart's store, he did not realize that the lot numbers matched exactly until after he had re-checked his inventory.

Bell of Hancock County and Agent Halkias of what he had seen in Swihart's shop.

Davis informed Agent Halkias that $65.00 was the same price at which he sold IMR, 30–31 gun powder to wholesalers in ton lots, and that the retail price for such powder as stated in a certain supply catalog was $105.85. The following day Agent Halkias telephoned two area gun stores and inquired as to the retail price of a 20-pound keg of Dupont IMR, 30–31 smokeless gun powder. One store stated that the retail price was $82.36; the other store informed Agent Halkias that the price was between $85.00 and $90.00. Agent Halkias and another Special Agent also drove past Swihart's store and obtained a physical description of the outside of the store, garage, and warehouse.

On February 29, 1976 Agent Halkias received a signed and sworn statement from Davis, which statement was subsequently attached to the affidavit for the search warrant. At that time he and Davis checked Davis' inventory. Agent Halkias discovered that 982 pounds of Dupont smokeless gun powder had been "stolen", which powder was valued at Davis' cost to be $2,897. Davis' records also indicated that since February 9, 1976, the date when Davis received his only three 20-pound kegs of Dupont IMR, 30–31 smokeless gun powder, Lot number P76JA09B–1353, he had not sold any IMR, 30–31 smokeless powder, and the check revealed that Davis was now missing one 20-pound keg.

The affidavit for the search warrant further recited in pertinent part:

> Mr. Davis also told me that he is one of nine distributors of Dupont Smokeless gun powder in the country, and that he has been in business for twelve years. He said that he handles approximately 75% of the distribution of Dupont smokeless gun powder east of the Mississippi River, and that he prides himself in knowing all of the people that he sells

powder to. Mr. Davis told me that after he left Swihart's store he went to Sheriff Bell of Hancock County and they both went to his magazine and took the lot numbers of the powder stock that the missing powder was taken from. At that time, he checked the lot number that he saw at Swihart's and it matched with the two kegs of 30–31 powder that he still had in his magazine, which was P76JA09B–1353.[4]

■ It is clear, of course, that a magistrate may rely on hearsay information which the affiant received from an informant. *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *United States v. Edmond*, 548 F.2d 1256, 1258 (6th Cir. 1977).

The appellee, however, contends that the affidavit for the search warrant did not satisfy the "two-pronged" standard for testing the sufficiency of affidavits for search warrants as set forth in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and explained in *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

This Court, in *United States v. Jenkins*, 525 F.2d 819, 822 (6th Cir. 1975), explained the two-pronged test as follows:

> The first prong requires that the magistrate be informed of some of the underlying circumstances on which the informant's conclusion was based, and the second prong requires that the affidavit show some of the underlying circumstances from which the affiant concluded that the informant (who need not be identified) was credible or his information reliable. 378 U.S. at 114, 84 S.Ct. 1509. And the latter case, *Spinelli*, supra, teaches generally that when an informer's tip is found wanting under *Aguilar*, the other allegations in the affidavit which corroborate the hearsay report should be considered, and the affidavit is to be deemed sufficient if it can fairly be said

---

4. Davis is licensed by the United States Treasury Department as a dealer in firearms and ammunition, with a license, number 43403201A7–07275, expiring on January 22, 1977; he is also licensed as a Dealer in Explosives, which license expired on April 13, 1976.

that the tip ". . . when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass Aguilar's tests without independent corroboration." 393 U.S. at 415, 89 S.Ct. at 588.

The District Court held that although the first requirement of the test was met by Davis' "detailed description of his observations" at Swihart's gun shop, the second requirement was "not met by any recital of facts that would support the credibility of the informant." We concur with the finding of the District Court that the affidavit recited the underlying circumstances upon which the informant based his conclusions, but we disagree with the Court's holding that the affidavit did not establish the general reliability of the informant or of his information.

We are not faced here with a situation where some of the more common methods of supporting the credibility of the informant were present, e. g., that the affiant had received reliable law enforcement information from the informant previously, *Jones v. United States, supra; United States v. Jenkins, supra,* at 823; that the informant's declaration was against his penal interest, *United States v. Harris,* 403 U.S. 573, 583–84, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); *United States v. Gardner,* 537 F.2d 861, 862 (6th Cir. 1976); *United States v. Rosenbarger,* 536 F.2d 715, 719 (6th Cir.), cert. denied —— U.S. ——, 97 S.Ct. 2920, 53 L.Ed.2d 1060, or that the affiant had knowledge of the suspect's background, reputation, and/or prior activities, *United States v. Harris, supra,* 403 U.S. at 583, 91 S. Ct. 2075. We are of the opinion, however, that there were other indicia of reliability in the affidavit in the present case from which the magistrate could conclude that Davis was credible or his information was reliable.

The Government argues that the *Aguilar-Spinelli* test was meant to deal only with search warrants issued on the basis of hearsay information received from unidentified and/or professional informants, relying on *United States v. Darensbourg,* 520 F.2d 985 (5th Cir.), *modified,* 524 F.2d 233 (1975), and

*United States v. Burke,* 517 F.2d 377 (2d Cir. 1975), and that, therefore, a strict application of the dual *Aguilar-Spinelli* requirements is not appropriate.

In *Burke* the defendant contended that the affidavit was inadequate because of the absence of a recital that the informant was known to the affiant to be reliable. The affidavit evidenced that the named informant had been in the defendant's bedroom and had talked with the defendant about the stolen firearm in question. Judge Friendly, holding that the magistrate had a "substantial basis" for crediting the hearsay, stated at 380:

. . . [T]here has been a growing recognition that the language in *Aguilar* and *Spinelli* was addressed to the particular problem of professional informers and should not be applied in a wooden fashion to cases where the information comes from an alleged victim of or witness to a crime.

In *Darensbourg* the Fifth Circuit held that while the affidavit supporting the search warrant in that case did not describe the named informant as being previously reliable, it was sufficient because it gave detailed information about the crime, and such detail supported an inference that the informant gained his information in a reliable way. *United States v. Darensbourg, supra,* at 988. *See Spinelli v. United States, supra,* 393 U.S. at 417, 89 S.Ct. 584; *United States v. Banks,* 539 F.2d 14, 17 (9th Cir. 1976).

The Court in *Darensbourg,* rather than indicate that the *Aguilar-Spinelli* test was addressed to professional informants, made a different distinction, stating at 989:

To decide this case, we need not restrict *Aguilar-Spinelli* to the professional informant. For the matter in hand—an identified nonprofessional—a line drawn at anonymity suffices, and we find significant Chief Justice Burger's statement that the *Aguilar* informant-reliability rule applies to "an affidavit based solely on the hearsay report of an *unidentified* informant," (emphasis added). *United States v. Harris,* 403 U.S. 573, 576, 91 S.Ct. 2075, 2078, 29 L.Ed.2d 723 (1971).

■ While we do not find it necessary to go so far as to limit strictly the *Aguilar-Spinelli* test to unidentified and/or professional informants, we are of the opinion that where, as here, the informant is an identified nonprofessional who is also the victim of the crime, the danger of casual rumor or irresponsible conjecture on the part of the informant is substantially diminished, and in assessing the probative value of the affidavit the magistrate and the reviewing courts should be all the more wary of applying—

> . . . hypertechnical or rigorous standards which would frustrate the efforts of law enforcement officials and actually prevent any enforcement of the firearms statute,

quoting from *United States v. Sevier*, 539 F.2d 599, 603 (6th Cir. 1976).

■ Moreover, in the case of the identified nonprofessional who is also the victim of the crime, the burden of satisfying the second prong of the *Aguilar-Spinelli* test, that the informant was credible or his information reliable, is less stringent than in the case of the unidentified and/or professional informant. In a case such as the one before us the particularization of the underlying circumstances as recited in the affidavit tends to take on its own intrinsic indicia of reliability; the distinction between the two branches of the *Aguilar-Spinelli* test becomes somewhat obfuscated, because the underlying circumstances which show how Davis secured his information and which satisfy the first prong, are also sufficiently detailed so that they contain "built-in credibility guides to the informant's reliability," *McCreary v. Sigler*, 406 F.2d 1264, 1269 (8th Cir.), *cert. denied*, 395 U.S. 984, 89 S.Ct. 2149, 23 L.Ed.2d 773 (1969), and thus the same underlying circumstances satisfy the second prong as well. As the D.C. Circuit stated in *Brown v. United States*, 125 U.S. App.D.C. 43, 365 F.2d 976, 979 (1966):

> Although the police could not here judge the reliability of the information on the basis of past experience with the informant . . . the victim's report has the virtue of being based on personal observation, a factor stressed in *Aguilar* . . . and is less likely to be colored by self-interest than is that of an informant. Admittedly a crime victim's observation may be faulty in some respects, as it may have been here; however, the mistakes are irrelevant if there is sufficient particularized information to constitute probable cause.

■ In the present case the detailed information provided by Davis in recounting his personal and recent observations was sufficient to base an inference that he gained his information in a reliable way and that his information was reliable. The affidavit recited that Davis had been a federally licensed firearms dealer for twelve years, and that he was one of nine distributors of Dupont smokeless gun powder in the country. The affidavit also provided detailed information, not only as to Davis' inventory which revealed a large quantity of missing gun powder, but also as to Davis' personal observation of 300 to 500 pounds of assorted Dupont gun powder in Swihart's gun store. The affidavit indicated that the lot number of one of Davis' missing kegs matched exactly the lot number of one of the gun powder kegs which Davis saw in Swihart's shop. The affidavit also recited the suspicious telephone conversation between Swihart and Davis, in which Swihart spoke of having been offered some gun powder which Swihart thought had been stolen. Further, even though independent corroboration was not necessary here because the tip, without corroboration, still passed the *Aguilar-Spinelli* test, it should be noted that Agent Halkias was able personally to observe Davis' demeanor in the process of checking with Davis his (Davis') inventory; and that he was able not only to confirm that certain Dupont smokeless gun powder (which had not been sold) was missing;[5] but

---

5. If Davis had sold the missing powder and failed to record the sale he would have been subject to penalty under Title 18 U.S.C. §§ 922(m) and 924(a), 27 C.F.R. § 178.125(c). It would be against the interest of the informant to engage in any such activity.

also undoubtedly he was able to discern the extent of Davis' business and therefore, to a certain extent to confirm Davis' allegation that he was a major distributor of Dupont gun powder. Also, Agent Halkias confirmed that there was a discrepancy between the price at which Swihart allegedly offered Davis the 20-pound keg of Dupont IMR, 30–31 smokeless gun powder and the higher retail price at which the same powder actually sold at two area gun stores.

Such particularization of the underlying circumstances, coupled with the inherent indicia of reliability of an identified nonprofessional, such as Davis, who also was the victim of the crime, sufficiently afforded probable cause for the search, and the magistrate was fully authorized to issue the search warrant.

■ We emphasize, as we have so often, that the "magistrate deals only with probabilities rather than certainties," quoting from *United States v. Jenkins, supra,* at 823, and that "[g]reat deference, even in a doubtful case, must be given by courts to the determination of magistrates," quoting from *United States v. Sevier, supra,* at 603. That determination should not be set aside unless arbitrarily exercised. *United States v. Giacalone,* 541 F.2d 508, 513–14 (6th Cir. 1976), and cases cited therein.

Also, as we stated in *United States v. Giacalone, supra,* at 514:

A further reason for avoiding a hypertechnical or rigorous standard for reviewing a search warrant is that a finding of insufficiency of an affidavit leads to suppression of evidence. The suppression of evidence seized pursuant to a search warrant should not be treated lightly; in suppressing evidence the truth is suppressed, and an investigation into a crime is impeded. See *McCray v. Illinois,* 386 U.S. 300, 307, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967).

See also *United States v. Edmond, supra.*

In our opinion the District Court erred in holding that the informant Davis was neither credible nor reliable.

We do not hesitate to say that the resolution of this issue, as in most such cases, is not easy, but "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). As the Supreme Court stated in an often-quoted passage in *Ventresca, supra,* at 108, 85 S.Ct. at 746:

If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a common-sense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

Accordingly, we are of the opinion that the affidavit in support of the search warrant afforded probable cause to search Swihart's gun shop, and that the determination of the magistrate in issuing the search warrant was proper and in no sense arbitrary.

The judgment of the District Court is therefore reversed and the cause is remanded with instructions to deny the motion to suppress.

EXHIBIT "A"

I hereby certify that this instrument is a true and correct copy of the original on file in my office.

Attest: Mark Schlachet, Clerk
U. S. District Court
Northern District of Ohio

By: Margaret B. (Illegible), Deputy Clerk

STATEMENT OF

Paul E. Davis, 5419 County Road 139, P.O. Box 743, Findlay, Ohio, made to Louis M. Halkias, Special Agent, ATF, on February 29, 1976, at 5419 County Road 139, Findlay, Ohio in the presence of Special Agent John W. West.

My name is Paul E. Davis. I am 43 years old and reside at 2419 South Main Street, Findlay, Ohio. For the last 12 years, I have been employed as General Manager and owner Davis Explosives Co. which is located at 5419 County Road 139, Findlay, Ohio. I am licensed by the U.S. Treasury Department as a dealer in firearms and ammunition with a license number 43403201A7–07275 which expires on 1–27–77. I am also licensed as a dealer in explosives and blasting agents, with a license number of 123500080 which expires on 4–13–76.

I am one of nine distributors of Dupont smokeless gun powder in the country. I handle approximately 75% of the distribution of smokeless powder east of the Mississippi River. I sell approximately 268094 pounds of smokeless gun powder. I pride myself in knowing all of the people that I sell gun powder too.

On Wednesday the 25th of February, I took inventory of my stock, and after returning to my office I discovered discrepancies in the quantity of powder I had on hand.

On Thursday the 26th of February, I returned to the magazine with my secretary to take an inventory. At that time, I estimated the discrepancy to 814 pounds, that I could not account for. At that time, I noticed that on Wednesday I had three 20 pounds kegs of IMR 30–31 powder and when I returned on Thursday I only had two kegs. I had lost more powder from Wednesday to Thursday.

That evening I remembered that I had received a call earlier that week from a Mr. Swihart who had a gun store in Fostoria, Ohio. In that telephone call Mr. Swihart asked me as to price, quantities and availability of Dupont gun powder. He stated to me that he had been approached a year ago by an individual that wanted to sell him some powder at such a ridiculous price that he thought it was stolen. He was sorry that he did not buy it. He also told me that he was going to go to Georgia and talk with some friends and see if they could split a ton of powder, and that he would get back with me. He also stated that he could get his supplies from Dayton Outdoor Sports Headquarters and that he could take it to his friends in Georgia and sell it to them cheaper than they could get it from their distributor.

On Friday, February 27, 1976, I went to Fostoria, Ohio to see if I could locate Swiharts gun store. I was curious to see his place because I never heard of him and wanted to see what kind of operation he had that would handle a ton of powder. His store is only fifteen miles from me.

Upon entering his store, I saw a 20 pound keg of Dupont IMR 43–20 smokeless gun powder next to some W.W. II Italian army helmets. I also saw several boxes of Dupont smokeless powder. They were composed of one stack of 700x caddies and one stack of mixed IMR cases. Each stack consisted of approximately six cases. At that time, a young lady asked me to wait for some assistance on purchasing powder. I then walked through the store and saw in a small adjoining room a 20 pound keg of Dupont IMR 30–31 and a 12 pound keg of Dupont 700x. I also saw two more stacks of assorted Dupont smokeless powder. At that time, I took down the lot number of the 20 pound keg of Dupont IMR 30–31 which was P76JA09B–1353. I wrote the number on a piece of paper that I later gave to Sheriff Bell. I then talked to a man who, I believe to be Mr. Swihart. I told him that my sons were new re-loaders and had asked me to shop for prices of twenty pound kegs of smokeless gun powder. He then offered me a twenty pound keg of Dupont 30–31 powder. He said that he got a hell of a deal on it and that he would sell it to me for $65.00 plus tax. He said that the next time that he bought it would go up in price. I told him that I

would check with my sons and that if they had that much money, I would be back to buy it. I then left the store.

I then went directly to Sheriff Bell of Hancock County, and told him of my loss. I then notified Agent Halkias, of A.T.F. I met the sheriff at the magazine which is located in Cass Township, Hancock County, and took the lot numbers from the remaining inventory of powder.

Sheriff Bell and I then went to the Fostria, Ohio Police Department and notified them of the loss, and of what had transpired in Swiharts Gun Store. I then returned home with Sheriff Bell. At that time, I gave him the piece of paper that I had written the lot number in Swiharts store.

On Sunday, February 29, 1976, I had a complete check of my inventory and discovered that I was, as best as I can determine, 982 pounds of smokeless powder short. This loss occurred between the time I took an inventory on February 10, 1976 to February 26, 1976, which was the last time I took inventory prior to knowledge of the loss.

I gave Agent Halkias an order form showing the quantity and type of Dupont smokeless powder that I am missing. I also gave Agent Halkias the lot numbers of the powder stock that the missing powder was taken from.

I also checked my records, tracing the sales of Dupont IMR 30–31 smokeless gun powder, in the inventory of December 17, 1975, I was completely out of Dupont IMR 30–31. I received three-twenty pound kegs of IMR 30–31 on February 9, 1976. Since February 9, 1976 to the present date, I have not sold any IMR 30–31 gun powder, yet my current inventory shows that I only have two-twenty pound kegs. I am short one keg of IMR 30–31 smokeless powder. I also received 100 pounds of IMR 43–20 smokeless gun powder in 20 pound kegs on February 9, 1976. Since that time I have not sold any IMR 43–20 and I only have 80 pounds in my inventory; I am missing one twenty pound keg of Dupont IMR 43–20 smokeless gun powder.

I have been in business for twelve years. I estimate my loss at this time to be $2,897.00, which is what the powder cost me. Also the twenty pound keg of IMR 30–31 gun powder which Swihart offered to sell me at $65.00, is the same price I sell it for, when dealers purchase one ton of powder from me.

I related to Special Agent Halkias the facts in the foregoing statement consisting of three pages which I have signed. I have been given an opportunity to make corrections and have initialed each correction made. This statement is true and correct.

/s/ PAUL E. DAVIS
President, Davis Explosives, Inc.

Signed and sworn to before me this 29th day of February, 1976.

/s/ LOUIS M. HALKIAS, Special Agent, ATF

Witness: /s/ JOHN W. WEST

### EXHIBIT "B"

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF OHIO, WESTERN DIVISION

United States of America

v.

Swihart's Gun Room, 343 W. South, Fostoria, Ohio with unattached garage in rear; and warehouse located at 113 N. County Line Road, Fostoria, Ohio.

Docket No. 76
Case No. 18-M
AFFIDAVIT FOR
SEARCH WARRANT.

BEFORE John A. Pietrykowski, 420 Madison Ave., Suite 700 Toledo, Ohio

(Name of Judge or Federal Magistrate)     (Address of Judge or Federal Magistrate).

The undersigned being duly sworn deposes and says:

That he has reason to believe that (on the premises known as)

Swihart's Gun Room, 343 West South, Fostoria, Ohio, further described as a one and one-half story wood frame dwelling with grey asbestos siding, white wood trim, and a green roof. In front, the building has

a double window on the second floor with an air conditioner in the right window. There is a picture window on the first floor in front, and a porch on the left side of the front of the building. There is an aluminum front storm door. The numbers 345 are colored red and placed over the door. There is a green metal sign in the front of the building which says: Swiharts Gun Room, Guns, and Shooters Supplies, phone 435-7696, parking in rear. It is the fifth building on the south side of the street facing West South Street from the intersection of South County Line Street and West South Street. There is also an alley on the east side of the building. The unattached garage, which is approximately 30 feet south of Swiharts Gun Room, is red brick with two overhead doors. The warehouse located at 113 North County Line, Hancock County, Fostoria, Ohio, is a one and one-half story white block building with olive green aluminum siding on the second story with a double window in the second floor. There is a grey metal door on the left side of the front of the building. There is a concrete and gravel parking lot in the front. The building is on the west side of North County Line Road.

There is now being concealed certain property, namely 982 pounds of Dupont smokeless gun powder, that is the following: 240 lbs.—Hi-Skor 700X, 4-5 lb. cans per case, 12 cases, Lot P76FE05B-17424; 36 lbs.—Hi-Skor 700X, 12 lb. kegs, Lot # P76JA20A-17422; 96 lbs.—SR-4756, in 4-4 lb. cans per case, 6 cases, Lot # P76JA27B-10158; 32 lbs.—SR-7625, in 4-4 lb. cans per case, 2 cases, Lot # P75DE08B-13190; 20 lbs.—IMR 30-31 in 20 lb. kegs, 1 keg, Lot # P76JA09B-1353; 20 lbs.—IMR 43-20, in 20 lb. kegs, 1 keg, Lot # P740C18-A-4109; 125 lbs.—IMR 40-64, in 25-1 lb. cans per case, 5 cases, Lot # P76FE05B-2340; 25 lbs.—IMR 41-98, in 25-1 lb. cans per case, 1 case, Lot # P76JA31C-3123; 50 lbs.—IMR 43-20 in 25-1 lb. cans per case, 2 cases, Lot # P76JA05A-5115; 150 lbs.—IMR 43-50, in 25-1 lb. cans per case, 6 cases, Lot # P76JA28C-6291; 25 lbs.—IMR 48-31, in 25-1 lb. cans per case, 1 case Lot # P76JA18B-28; 75 lbs.—IMR 48-95, in 25-1 lb. cans per case, 3 cases, Lot # P76JA28-7785; 32 lbs. of PD, 4-4 2 cases, Lot # P76JA26B-14444; 24 lbs. of SR-7625, 2, 12 lbs. kegs, Lot # P76JA15C-13191; 32 lbs IMR 40-64, 4-8 lb. cans, 1 case, Lot # P75AP10B-2326, or P75MY02B-2326, and ammunition records which is required in Title 18, USC Chapter 44, part 178.125, record of receipt and dispositions and items of an evidentiary nature, which are in violation of Title 18, USC Sections 922(i), 922(m) and 924(d).

And that the facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows:

On February 26, 1976, at approximately 2:30 p. m., I received a telephone call from Paul Davis, President and owner of Davis Explosives Co., which is located at 5419 County Road 139, Findlay, Ohio. He told me that on Wednesday, the 25th of February, 1976, he took an inventory of his stock and discovered a discrepancy in the amount of smokeless gun powder he had. He rechecked his inventory on Thursday with his secretary and discovered that he was missing about 800 pounds of gun powder which he had stored in his magazine, which is located in Cass Township, Findlay, Hancock County, Ohio. He even noticed that he was missing a 20- pound keg of Dupont IMR, 30-31 smokeless gun powder, Lot # P76JA09B-1353, that he knew he had on Wednesday. That evening he remembered a telephone call that he had received earlier that week from a Mr. Swihart inquiring as to price, quantities and (CONTINUED ON REVERSE) (CONTINUATION OF GROUNDS FOR SEARCH WARRANT) availability of Dupont gun powder. Mr. Swihart has a gun store in Fostoria, Ohio. Mr. Swihart also stated to Mr. Davis that he had been approached a year ago by an individual that wanted to sell him some powder at such a ridiculous price that he thought it was stolen. He was sorry that he did not buy it. Swihart also stated that he was going to go to Georgia and talk with

some friends and see if they could split a ton of powder, and that he would get back with him.

Mr. Davis told me that on Friday, February 27, 1976, he went to Fostoria, Ohio, to see what Swihart's gun store looked like. He said that he knew all of his customers and was curious as to how he didn't know about a gun dealer that was only fifteen miles from him that could sell a large quantity of smokeless powder.

Upon entering the store, Mr. Davis told me that he saw a 20-pound keg of Dupont IMR- 43–20 smokeless gun powder. He also saw several boxes of Dupont smokeless powder, consisting of one stack of 700X caddies and one stack of mixed IMR cases. Each stack consisted of approximately six cases. While waiting to be served, he walked through the store and saw in a small adjoining room a 20 pound keg of Dupont IMR 30–31 and a 12 pound keg of Dupont 700X. He told me that he also saw two more stacks of assorted Dupont smokeless powder. At that time, Mr. Davis wrote the lot number which was on the 20 pound keg of Dupont IMR 30–31, which was P76JA09B–1353. Mr. Davis explained to me what the lot number meant. The (P) stands for the plant it was made at (76) is the year it was made, (JA) is January the month (09) is the date, (B) is the second shift, and 1353 is the number of the batch that the particular powder came from.

Mr. Davis told me that he told Mr. Swihart that he was shopping for some smokeless powder for his sons, and that if he had any for sale. Mr. Swihart offered to sell the 20 pound keg of Dupont 30–31 smokeless gun powder. Mr. Swihart also said that he got a hell of a deal on it and that he would sell it to him for $65.00 plus tax. Swihart said that the next time he bought that powder the price would increase. Mr. Davis said that he would check with his sons and that he would be back, at which time Mr. Davis left the store.

Mr. Davis then went to Sheriff Bell of Hancock County and told him of the loss of what he saw in Swihart's gun store. It was at that time Mr. Davis informed me of the loss and of what he saw in Swihart's Gun Store. He told me that the 30–21 powder that Swihart offered to sell him at $65.00 was the price that he sold it to dealers if they bought a ton of powder from him. He also told me that the retail price for that powder in Buckeye Shooter's Supply Catalog was $105.85.

He also told me that he saw approximately 300 to 500 pounds of Dupont smokeless powder in Swihart's store.

Mr. Davis also told me that he is one of nine distributors of Dupont Smokeless gun powder in the country, and that he has been in business for twelve years. He said that he handles approximately 75% of the distribution of Dupont smokeless gun powder east of the Mississippi River, and that he prides himself in knowing all of the people that he sells powder to. Mr. Davis told me after he left Swihart's store, he went to Sheriff Bell of Hancock County and they both went to his magazine and took the lot numbers of the powder stock that the missing powder was taken from. At that time, he checked the lot number that he saw at Swihart's and it matched with the two kegs of 30–31 powder that he still had in his magazine, which was P76JA09B–1353.

On Saturday, February 28, 1976, I telephoned Kowalka's Gun Store in Northwood, Ohio and asked for the retail price of a 20 pound keg of Dupont IMR 30–31 smokeless gun powder. They informed me that the price was $82.36.

On the same day, I telephoned Cleland's Gun Store for the price of a 20 pound keg of Dupont IMR 30–31 smokeless gun powder. They informed me that the price would be between $85.00 and $90.00.

On Saturday, February 28, 1976, Special Agent John West and I drove past Swihart's Gun Room and obtained a physical description of his Gun Store, unattached garage and warehouse. On Sunday, February 29, 1976, I received a signed and sworn statement from Paul E. Davis, President, General Manager and Owner of Davis Ex-

plosives Co. I also checked with Mr. Davis, the inventory and found that he had 982 pounds of Dupont smokeless gun powder stolen which was valued at his cost to be $2,897.00. Also, in checking his records I found that in the inventory of December 17, 1975, he was completely out of Dupont IMR 30–31, 20 pound kegs. On February 9, 1976, Davis received three, twenty pound kegs of Dupont IMR 30–31 with the Lot # of P76JA09B–1353. Mr. Davis' records reflect that since February 9, 1976, the date he received that powder, to the present date, he has not sold any IMR, 30–31 smokeless powder but that he is short one twenty pound keg.

On Sunday, February 29, 1976, I received a signed and sworn statement from Paul E. Davis, which is attached to the (affidavit) Search Warrant.

On the same day, Mr. Davis gave me an inventory of his losses, which is attached to the (affidavit) Search Warrant.

> (signed) Louis M. Halkias
> Louis M. Halkias, Special Agent,
> Bureau of Alcohol, Tobacco & Firearms
> (Official Title)

Sworn to before me, and subscribed in my presence, ——, 19—.

> (signed) John A. Pietrykowski
> John A. Pietrykowski
> Judge or Federal Magistrate

"Certified to be a true copy 25"

\* COPY \*