**UNITED STATES of America**

v.

**James T. CALLAGHAN.**

**Crim. No. 77–00375.**

United States District Court, D. New Jersey.

Feb. 22, 1978.

Robert J. Del Tufo, U. S. Atty. by Stephen R. Mills, Asst. U. S. Atty., Newark, N. J., for United States of America.

Herbert M. Barnes, Cranford, N. J., for defendant.

## OPINION

BROTMAN, District Judge.

Defendant James T. Callaghan is charged with the illegal manufacture and possession of a controlled substance in violation of 21 U.S.C. § 841(a). On October 2, 1977, evidence was seized at the home of the defendant pursuant to the execution of a search warrant issued by United States Magistrate Serena Perretti. Before the Court are defendant's motions to impeach the search warrant affidavit and suppress the evidence seized thereunder. A hearing was held on December 13 and 14, 1977.[1]

The defendant makes several contentions in support of his motions. First, it is claimed that the affidavit used in obtaining the search warrant fails, on its face, to establish probable cause needed for the issuance of a warrant. Second, it is claimed that, notwithstanding the facial sufficiency of the warrant, the evidence must be suppressed because of certain critical misinformation which the affiant, in support of the warrant, presented to the magistrate. Finally, the defendant contends that he has a right to have the informants produced for cross-examination in order to give the defendant an opportunity to demonstrate the de facto absence of probable cause.[2]

---

1. After the hearing, the court denied defendant's motions from the bench. This opinion is intended to explain the reasoning behind the Court's decision.

2. The defendant also raises several other objections including the manner of the warrant's execution, the use of the term "vicinity" in the warrant, etc. The court finds these points un-

## I. FACIAL SUFFICIENCY OF THE SEARCH WARRANT [3]

■ It is well established that a magistrate may rely on hearsay information which an affiant receives from confidential informants. *Jones v. U. S.*, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *U. S. v. Edmond*, 548 F.2d 1256, 1258 (6th Cir. 1977). However, in order to guard against police abuses of the informant procedure, the Supreme Court has announced specific standards which must be satisfied for an informant's hearsay statements to meet the strictures of the Fourth Amendment. *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1963); *Spinelli v. U. S.*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *U. S. v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). *Aguilar*, as modified by *Spinelli* and *Harris*, established a flexible two-prong test which was recently explained by the Sixth Circuit in *U. S. v. Jenkins*, 525 F.2d 819, 822 (1975):

> The first prong requires that the magistrate be informed of some of the underlying circumstances on which the informant's conclusion was based, and the second prong requires that the affidavit show some of the underlying circumstances from which the affiant concluded that the informant (who need not be identified) was credible or his information reliable. 378 U.S. at 114, 84 S.Ct. 1509. And the latter case, *Spinelli, supra,* teaches generally that when an informer's tip is found wanting under *Aguilar*, the other allegations in the affidavit which corroborate the hearsay report should be considered, and the affidavit is to be deemed sufficient if it can fairly be said that the tip ". . . when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration." 393 U.S. at 415, 89 S.Ct. at 588.

The warrant at issue in the case *sub judice* is based on the information of three confidential sources (CS # 1, CS # 2 and CS # 3) together with the observations and conclusions of Drug Enforcement Administration (DEA) agents assigned to the Newark District office. The affiant, Special Agent (SA) Adam Mangino, stated he received information from CS # 1, a reliable informant, that "one James T. Callaghan, a/k/a Beau T. [was] in the process of preparing to manufacture PCP [Phencyclidine] at his residence, 31 Norwood Ave., Montclair, N.J." CS # 1 also stated to the affiant that Callaghan usually distributed the PCP through several couriers who picked up the drug immediately after its production was completed.

Were this all the information in the affidavit, the Court would be compelled to reject it on the basis of *Aguilar, Spinelli* and *Harris*. While there is information indicating the reliability of CS # 1,[4] this informant does not indicate, in specific enough detail, how he reached his incriminating conclusions. Based solely on CS # 1, the magistrate could not conclude that "he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli, supra,* 393 U.S. at 416, 89 S.Ct. at 589. Moreover, the information of CS # 2 and CS # 3,[5] standing alone, would not constitute probable cause since there is no information, other than the conclusions of the affiant, which would allow the magistrate

---

worthy of extended discussion. They will be briefly mentioned within.

**3.** The affidavit submitted in support of the warrant is attached hereto as Exhibit 2. [See Appendix.]

**4.** The affidavit indicated that CS # 1 recently provided the affiant with information which led to the seizure of an active PCP laboratory within the past month. This information satisfies the requirement of "prior reliability" an-

nounced in *Aguilar, supra,* 378 U.S. at 114–115, 84 S.Ct. 1509, and later questioned in *Harris, supra,* 403 U.S. at 582–583, 91 S.Ct. 2075.

**5.** CS # 2 provided information to the affiant that James T. Callaghan, on October 1, 1977, obtained chemicals that are ingredients used to manufacture PCP. CS # 3 informed the affiant that Callaghan would complete the PCP manufacturing process on October 2, 1977.

to deduce that these two sources were reliable.

Despite the weaknesses in the confidential source information, the Court cannot end its inquiry without looking at the entire affidavit. There is independent information which corroborates the hearsay reports and supports probable cause. *See U. S. v. Jenkins, supra* at 822; *Spinelli, supra* at 415, 89 S.Ct. 584; *Harris, supra,* 403 U.S. at 580–581, 91 S.Ct. 2075; *U. S. v. McNally,* 473 F.2d 934 (3d Cir. 1973). The affidavit indicates that, after receiving CS # 1's information, DEA agents observed a dark colored van with out-of-state license plates stop at the Callaghan residence on October 2, 1977, at approximately 11:30 a.m., and then depart after a conversation with Callaghan. The magistrate was also informed that DEA agents detected a strong smell of ether in the vicinity of the Callaghan residence during this same period of observation on October 2. SA Mangino thereafter concluded, based on his experience in previous investigations, that the PCP manufacturing process, usually accompanied in its last stages by a strong smell of ether, was nearing completion.

Based on the totality of information contained in the affidavit, the Court concludes that the precautionary requirements of *Aguilar, Spinelli* and *Harris* are present and that the affidavit, in its entirety, clearly demonstrates the necessary probable cause for the issuance of a warrant. While CS # 1 did not provide any detail indicating how he reached his incriminating conclusions, he was clearly a reliable informant since he had given similar information less than a month prior to this time which had resulted in the seizure of another PCP laboratory. Additionally, this lack of detail was offset by the independent corroboration of DEA agents together with the statements of CS # 2 and CS # 3. A possible drug courier with foreign license plates was observed at the Callaghan residence in Montclair on the morning of October 2, 1977. This corroborated the information supplied by CS # 1 and CS # 3. More importantly, DEA agents detected a strong smell of ether, known by SA Mangino to be indicative of the final phase of PCP preparation, in the vicinity of the Callaghan residence on the morning of October 2. Viewing these circumstances, the Court concludes that the information was equally as reliable and trustworthy as that which would pass constitutional muster without independent corroboration. *Spinelli, supra,* 393 U.S. at 415, 89 S.Ct. 584; *U. S. v. Jenkins, supra* at 822; *U. S. v. Toral,* 536 F.2d 893 (9th Cir. 1976); *U. S. v. Scott,* 555 F.2d 522, 527 (5th Cir. 1977); *U. S. v. Swihart,* 554 F.2d 264 (6th Cir. 1977); *U. S. v. Singleton,* 439 F.2d 381, 383–384 (3d Cir. 1971); *U. S. v. Kemp,* 421 F.Supp. 563 (W.D.Pa.1976). The magistrate's decision to issue the warrant was entirely reasonable and consistent with the Fourth Amendment.

## II. MISINFORMATION IN THE AFFIDAVIT

The government concedes that there is certain inaccurate information contained in the affidavit of SA Mangino. It also concedes that a hearing is necessary in order to resolve the issue of whether the inaccuracies are sufficient to negate the validity of the warrant and require the suppression of the seized evidence. *See U. S. v. Carmichael,* 489 F.2d 983, 988 (7th Cir. 1973); *Petillo v. N. J.,* 400 F.Supp. 1152, vacated, 541 F.2d 275 (3d Cir.), on remand, 418 F.Supp. 686 (D.N.J.1976); *U. S. v. Baynes,* 400 F.Supp. 285, 296 n. 20 (E.D.Pa.1975). The question presented is whether the defendant has impeached the affidavit to the point at which the evidence must be suppressed.

### A. *The Suppression Hearing*

The government produced three witnesses at the hearing held on December 13 and 14, 1977; Special Agent (SA) Robert J. Marsh, SA Adam Mangino and SA Victor Pedalino.

Robert J. Marsh, an experienced DEA agent in the field of clandestine laboratory investigations, testified concerning the field surveillance of defendant Callaghan's residence on Sunday, October 2, 1977. SA Marsh arrived at a position approximately

half a block from 31 Norwood Avenue at approximately 9:45 a.m. and began observations of the residence. Shortly after his arrival, he noticed the strong smell of ether in the neighborhood of the Callaghan house. On various surveillance trips in front of the residence, SA Marsh noted that the smell of ether abated in front of the driveway at 31 Norwood Avenue. At approximately 11:00 a.m. SA Marsh noted the arrival of a van in front of the Callaghan residence. Soon thereafter, several other support units (local police and DEA personnel) arrived near the 31 Norwood Avenue location. The passenger in the van made several trips to and from the Callaghan residence. The van and its two occupants left the area at approximately 11:45 a.m. according to SA Marsh. Later that day, at approximately 7:30 p.m., DEA agents, armed with a search warrant procured in midafternoon, approached the Callaghan residence just as the defendant and a companion, Mr. Kenneth Beitz, emerged from the front of the house. SA Marsh testified that a DEA agent ordered the men to "freeze" but that they ran back into the house and slammed the door shut. At that point SA Marsh was ordered to cover the back door. Subsequently, he heard several loud "pops" which were later identified as rounds being discharged.

SA Adam Mangino, the DEA case agent in charge of this particular operation, testified that he had been in contact with SA Marsh at approximately 9:30 a.m. on the morning of October 2, 1977, via the police radio in his car. SA Mangino arrived in Montclair and stationed himself in the rear of a grocery store parking lot approximately 1½ blocks from the Callaghan residence. He directed the operation from this point and was in constant communication with the responsible DEA agents and police personnel throughout the day of October 2, 1977. SA Mangino stated that the information contained in the last sentence of paragraph 6 of the affidavit was now known by

him to be incorrect. SA Mangino admitted that, during the conversations between himself and SA Marsh, he could have erroneously assumed that a conversation had taken place between the van's occupant (Mr. Beitz) and defendant Callaghan. On cross-examination, SA Mangino also admitted that the time listed in paragraph 7 of the affidavit could have been inaccurate.[6] SA Mangino could not recall which particular DEA agents smelled the ether in addition to SA Marsh but he indicated that there were others. SA Mangino also indicated that he personally received the relevant information from all the confidential sources concerning the alleged criminal activity of defendant Callaghan.

Regarding the execution of the warrant, SA Mangino stated that he, along with several individuals from the Montclair police force and other DEA agents, attempted to place Callaghan and Mr. Beitz under arrest at approximately 7:30 p.m. on October 2, 1977. SA Mangino ordered both individuals to halt but they ran back into the house and slammed the door behind them. At this point the officers ran to the front door, banged on it several times, ordered the occupants to open the door and then forcibly entered the premises when there was no response to their commands. Several shots were fired at a Doberman pinscher which approached the officers as they entered the premises.[7] Thereafter both the defendant and Mr. Beitz were placed under arrest.

The defense produced four witnesses at the hearing: Kenneth J. Beitz, a friend of the defendant, Harold D. Swisher, a mutual friend of Kenneth Beitz and the defendant, Donna De Pasquale, an informal tenant at the Callaghan residence and James Callaghan, Jr., a son of the defendant.

Kenneth Beitz testified that he and Mr. Swisher attempted to visit the defendant at his Montclair residence (in Mr. Swisher's black Ford van) between 11:00 and 11:30 a.m. on the morning of October 2, 1977. He

---

6. Paragraph 7 of the affidavit stated that DEA agents smelled ether at 11:00 a.m. SAs Marsh and Mangino both indicated that the smell of ether had been detected immediately upon SA Marsh's arrival at 9:45 a.m.

7. The dog was injured but not killed by the shots.

and Mr. Swisher left the area in the van after several attempts to rouse the occupants proved fruitless. Mr. Beitz testified that he returned to the premises between 2:00 and 2:30 p.m. in his wife's car in order to paint a bedroom on the second floor of the Callaghan residence. He first became aware of the police presence when he heard the sound of breaking glass and gunshots around 7:30 p.m. on the evening of October 2.

Harold Swisher testified that he and Mr. Beitz drove to the Callaghan residence in order to pay the defendant a friendly visit. He corroborated the testimony of Kenneth Beitz with respect to the time of the visit and the unsuccessful attempts to gain the attention of the occupants.

James Callaghan, Jr., fourteen year old son of the defendant, testified that he was home all day at his house on Norwood Avenue watching television. While on the second floor watching television at approximately 7:30 p.m., he became frightened when he heard the sound of breaking glass and gunshots. He also stated that he had seen his father and Mr. Beitz being treated roughly by the police.

On December 14 the Court requested further testimony from the government witnesses in order to clarify further the reasons for the inaccuracy in the affidavit. SA Marsh stated that, when the van arrived at approximately 11:00 a.m., he was the only DEA agent on the scene. He was communicating by radio with SA Mangino and other agents. SA Marsh was apprehensive about the possibility of singlehandedly confronting two or three people who were allegedly engaged in drug smuggling activities. In addition to relaying information about the location of the van and its occupants, he communicated the urgent need for support units. SA Mangino testified that he could have been mistaken in his recollection of the transmission from SA Marsh indicating that a conversation between the van occupant (Mr. Beitz) and Mr. Callaghan took place.

After considering all the evidence adduced at the hearing held December 13 and 14, 1977, the Court is persuaded that the government witnesses were more credible and persuasive. The Court is, therefore, inclined to disregard the testimony of Kenneth Beitz, Harold Swisher, Donna De Pasquale, and James Callaghan, Jr. The Court bases this conclusion essentially upon the demeanor of the witnesses, omissions and inconsistencies in their testimony, and upon the obvious biases of the witnesses toward defendant James T. Callaghan.

### B. *Legal Conclusions*

Before proceeding to the central issue in this case, it is important to touch upon several contentions of the defendant which are not worthy of detailed discussion. First of all, accepting the government witnesses' testimony as credible, it is frivolous to argue that the manner of the warrant's execution was in violation of 18 U.S.C. § 3109.[8] The credible evidence indicates that the officers did, in fact, comply with this section. Furthermore, the Court is not in the least persuaded that the use of the word "vicinity" in paragraph 7 of the search warrant affidavit is ambiguous. It is evident that the smell of ether could not, standing alone, give probable cause for the search of *any* residence on Norwood Avenue, let alone number 31. However, the smell did not stand by itself but was one of many indicia pointing to the criminal involvement of defendant Callaghan at his Norwood Avenue residence. Together with the informant reports and the observations of DEA agents, the smell of ether in the vicinity of 31 Norwood Avenue is highly probative and corroborative of the presence of PCP at that location.

The Court now confronts the legal significance of the inaccuracies in the search warrant. The Third Circuit has had occasion to discuss the analogous subject of wiretap

---

**8.** This section reads: "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate

applications[9] but has never determined what particular standards govern the suppression of evidence seized as a result of a materially inaccurate warrant. Two recent district court decisions in this circuit have thoroughly discussed the approaches of other circuits. In *U. S. v. Chadwell*, 427 F.Supp. 692, 694–695 (D.Del.1977), a warrant had been issued based upon what later proved to be partly inaccurate information. The police affidavit stated that the confidential informant saw purportedly stolen mag wheels in the home of the defendant. Later testimony at the suppression hearing indicated that the wheels were located in the garage rather than in the residence. The defendant's contention in *Chadwell* was similar to the argument raised here:

> On the basis of this impeaching testimony, defendant contends that paragraph 27 of the affidavit filed in support of the search warrant misrepresented the location of the mag wheels, that this misrepresentation was material to the magistrate's finding of probable cause to search defendant's residence, and that because of the misrepresentation of that material fact, the evidence seized in the residence under the search warrant must be suppressed. In support of this contention, defendant relies upon the law of the Seventh and Eighth Circuits that suppression is required if it is found that governmental authorities have intentionally or recklessly misrepresented a material fact in a probable cause affidavit, *United States v. Carmichael*, 489 F.2d 983, 988–989 (C.A.7, 1973); *United States v. Marihart*, 492 F.2d 897, 900 (C.A.8, 1974), *cert. denied* 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974), or the law of the Fifth Circuit which holds that contraband seized pursuant to a search warrant must be suppressed if the probable cause affidavit contains a misrepresentation (1) made with intent to deceive the magis-

trate regardless of whether the error was material to showing probable cause or (2) made unintentionally but the erroneous statement is material to establishing probable cause for the search. *United States v. Thomas*, 489 F.2d 664, 669 (C.A.5, 1973).

Chief Judge Latchum concluded that the misstatement was neither intentional nor material to a showing of probable cause. The suppression motion was therefore denied. In *U. S. v. Teti*, 422 F.Supp. 128, 132–134 (E.D.Pa.1976), the court was faced with a situation in which an informant gave inconsistent information to the affiant. The informant stated that he saw the defendant during a particular weekend but the dates which the informant gave fell primarily on a weekday. The court found the incorrect dates in the affidavit to be of little importance as far as the probable cause determination was concerned.[10]

In *U. S. v. Astroff*, 556 F.2d 1369 (5th Cir. 1977), the court re-examined the principles of its 1973 case, *U. S. v. Thomas, supra*, one of the earliest cases on warrant misrepresentations. After noting that *Thomas* explicitly reserved decision as to the type of police conduct necessary to suppress non-intentional, material misrepresentations in an affidavit, the court concluded that even negligent misstatements by government agents in affidavits warranted suppression as long as the statements were material to the probable cause determination. 556 F.2d at 1372–1374. Of paramount importance was the court's interpretation of the term "material":

> The cases tend to confuse the standards for excision in the review process and invalidation of the affidavit. The proper approach and that generally taken, consistent with the holding in *Thomas*, is to consider the affidavit absent the unintentional misstatement. If the remaining

---

himself or a person aiding him in the execution of the warrant."

**9.** *See U. S. v. Vento*, 533 F.2d 838, 858 (3d Cir. 1976) (misstatement of fact in application for wiretap authorization).

**10.** *Teti* was concerned primarily with misinformation provided by an informant, not with misinformation provided by a government agent. Therefore, the court was reluctant to penalize the government for misfeasance on the part of an informant. The case sub judice involves the actions of a government agent and hence does not involve the same reluctance of the Court.

averments do not establish probable cause, the misstatement was "material" and the court must then confront the question of what degree of unintentional material misstatements should invalidate search warrant affidavits. 556 F.2d at 1373 n. 3.

Although not so explicitly stated, this methodology has been employed in the Third Circuit as well. *See, e. g., U. S. v. Vento, supra* at 858 (even without misstatement in wiretap application, probable cause was present).

■ Applying the facts of this case to the applicable legal standards, it becomes clear that the misstatements by SA Mangino in his affidavit were immaterial to the probable cause determination. Excising the last sentence of paragraph 6 of the affidavit does not negate the crux of the probable cause rationale previously outlined. The probative value of the hearsay statements together with the strong smell of ether and the admittedly valid observation of a van with out-of-state plates in front of the Callaghan residence is not significantly undermined by excision of an admittedly non-existent conversation between an occupant of the van and defendant Callaghan.[11] The error was immaterial to the magistrate's decision to issue the warrant.

■ The defendant raises several other contentions involving misrepresentations in the affidavit which can be disposed of summarily. The first involves the allegation that paragraph 7 is fatally defective because it specifies 11:00 a.m. as the time when ether was detected in the vicinity of the Callaghan residence and because there was, according to the defendant, only one DEA agent (SA Marsh) who detected ether in the vicinity of the house. Quite simply, the Court does not find any misstatement of fact. SA Marsh detected a strong smell of ether throughout the morning of October 2, 1977.[12] SA Mangino was certain that there was one other agent who had walked past the Callaghan residence and detected ether but SA Mangino could not remember his name.[13]

■ The final contention of the defendant respecting the affidavit is that the Court, upon a showing of the inaccuracy in paragraph 6, is obliged to produce the informant for cross-examination by the defendant on the probable cause issue. The defendant cites *Petillo v. New Jersey, supra,* in support of this contention. *Petillo,* however, stands primarily for the proposition that a state must give a defendant a full and fair opportunity to litigate his Fourth

11. Since the error is immaterial, suppression should result only if the misrepresentation was intended to deceive the magistrate. Certainly the misrepresentations in the affidavit were neither deliberate nor reckless. Upon extended testimony, at the direction of the Court, it became evident that the inclusion of the last sentence of paragraph 6 was the result of a breakdown in communications between SA Mangino, who was preoccupied with organization and communication among the various agents in addition to receiving information from SA Marsh, and SA Marsh, who was concerned about his ability to cover the precarious situation while reporting on events which were the subject of the later affidavit.

SA Marsh's testimony also revealed that the van passenger waited at the front door of the Callaghan residence for several minutes, returned to the van and spoke with the driver, and then disappeared around the back of the house before returning to the van. This sequence of events could have confused SA Mangino and led to the erroneous information. Under the circumstances it is evident that the inclusion of erroneous information in the affi-

davit was an innocent mistake on the part of the DEA agents.

12. The defendant makes much ado about certain discrepancies between the affidavit and the DEA surveillance report prepared from memory by SA Mangino several days after the search warrant was executed. DE 1. This commotion is unwarranted. The proper focus in a suppression hearing is upon representations in the affidavit and events as they actually transpired. Although the agent's report does vary in some minor details with the affidavit, such variance is immaterial to the issue before the Court. Indeed, any discrepancies were adequately explained by SA Mangino who stated that he did not refer to the affidavit in preparing his surveillance report.

13. Even if there were held to be inaccuracies in paragraph 7 of the affidavit, they would not be fatal to the validity of the warrant. The probative value of the ether smell is not undermined by excising the precise time of day or by reducing the number of agents who detected the scent.

Amendment claim once a showing of deliberate falsity in the affidavit has been demonstrated. *Roviaro v. U. S.*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), *McCray v. Illinois*, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967), and *U. S. v. Jackson*, 384 F.2d 825 (3d Cir. 1967), *cert. denied*, 392 U.S. 932, 88 S.Ct. 2292, 20 L.Ed.2d 1390 (1968), indicate that a trial court must take certain steps to protect a defendant's right to a fair trial when the informant might be in possession of exculpatory evidence. However, none of these cases holds that an informant must routinely be produced in a pretrial suppression setting. *See, e. g., U. S. v. Allen*, 566 F.2d 1193 (3d Cir. 1977). Indeed, the trilogy of informant cases, *Aguilar, Spinelli* and *Harris*, was designed to avoid disclosure while at the same time assuring the reliability of the process. This Court sees no reason to require disclosure of the informant's identity or even production of the informant for in camera testimony in view of the immaterial and innocent nature of the affidavit inaccuracies. If the errors were more substantial or the defendant were able to show a more specific need for the disclosure, a different result might be indicated. *See Petillo v. New Jersey, supra; U. S. v. Moore*, 522 F.2d 1068, 1071–1073 (9th Cir. 1975).[14]

### III. APPEAL FOLLOWING GUILTY PLEA

After the Court denied defendant's suppression motion from the bench on December 14, 1977, both counsel entered into an agreement whereby the defendant would plead guilty to both counts of the indictment and the government would consent to appellate review of the Fourth Amendment issues litigated before this Court on December 13 and 14, 1977. The Court has considered this arrangement and finds it entirely consistent with *U. S. v. Zudick*, 523 F.2d 848, 851–852 (3d Cir. 1975), where conditional guilty pleas were expressly approved in certain situations. In this setting, the policy rationale of *Zudick* is persuasive.

### IV. CONCLUSION

After considering the briefs and arguments of counsel· as well as the testimony adduced at the hearing on December 13 and 14, 1977, the Court concludes that defendant's motions should be denied.

The appropriate order was heretofore entered into the record on December 14, 1977.

### APPENDIX

### EXHIBIT 2

State of NJ
County of Essex } ss

Adam Mangino, of full age, being duly sworn, deposes & says:

1. I am a special agent of the Drug Enforcement Administration (DEA), assigned to the Newark District Office.

2. Within the past month, I received information from an informant (CS # 1) whose reliability has been proven by a seizure of an active phencycledine (PCP) laboratory within the past month. That seizure was based on information received from CS # 1. CS # 1 has informed me that one James T. Callaghan, a/b/a Beau T, is in the process of preparing to manufacture PCP at his residence, 31 Norwood Avenue, Montclair, N.J.

3. Another reliable informant (CS # 2) has provided information to me in the past week that Callaghan picked up chemicals that are precursor ingredients for the manufacture of PCP. CS # 2 advised me that these chemicals were received by Callaghan on October 1, 1977.

4. A third reliable informant (CS # 3) whose information received this past month has been corroborated by my investigation told me this past week that Callaghan would complete the process of manufacturing PCP on October 2, 1977.

14. In a gesture of caution, the Court required the government to produce the DEA debriefing reports of the confidential sources for in camera review. Although the reports do not provide extensive explication of the information contained in the affidavit, they do represent corroborative evidence of the very existence of the informants. This question was raised by the defendant at the suppression hearing.

5. CS # 1 stated to me in the past week that Callaghan distributes PCP through several couriers who pick up the PCP immediately after its manufacture.

6. The information contained in ¶ 5 was corroborated at approximately 11:30 A.M. on October 2, 1977, when DEA agents observed a dark colored van with out of state license plates (West Virginia) visit 31 Norwood Avenue, which is Callaghan's residence. The unknown male driving the van conversed with Callaghan and then departed the area.

7. Surveillance by DEA agents at approximately 11:00 A.M. on October 2, 1977 determined that there was a strong smell of ether in the vicinity of 31 Norwood Avenue.

8. Based on my experience as a DEA agent, which includes several PCP investigations, the smell of ether indicates that the manufacturing process is in its last stages.