UNITED STATES of America,
Plaintiff-Appellee,

v.

Clyde Winton JENKINS,
Defendant-Appellant.

No. 74–1033.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 8, 1974.

Decided Nov. 12, 1975.

Jay Fred Friedman, Memphis, Tenn. (Court appointed—CJA), for defendant-appellant.

* Judge O'Sullivan participated in this per curiam opinion prior to his death.

Thomas F. Turley, U. S. Atty., Larry E. Parrish, Asst. U. S. Atty., Memphis, Tenn., for plaintiff-appellee.

Before CELEBREZZE and MILLER, Circuit Judges, and O'SULLIVAN,* Senior Circuit Judge.

PER CURIAM:

Defendant-Appellant Clyde Winton Jenkins appeals from his conviction by a jury on the first count of a two-count indictment[1] which charged him with violation of 21 U.S.C. § 846, conspiracy to commit various offenses defined in the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 et seq.

Jenkins raises five claims of error, each of which is discussed below.

We affirm.

## I. The Search Warrant

Appellant first asserts that the District Court erred in denying his motion to suppress two firearms obtained from his residence in Muskogee, Oklahoma in a search authorized by a United States magistrate. Specifically, it is said that the affidavit presented to the magistrate in support of the search warrant which he issued was insufficient to establish probable cause.

The document complained of was sworn to by Aaron C. Elliott, a Special Investigator of the Bureau of Alcohol, Tobacco and Firearms of the Department of the Treasury on March 13, 1972, the same date on which the warrant issued and was executed. It first described the "Clyde Jenkins Premises" as a specified address as well as three automobiles (including a "black over white Pontiac bearing Okla 72 license MG 9593") said to be parked there, and then stated that the objects of the search were "firearms," naming "a Colt Diamondback revolver and an M–1 Carbine

1. Appellant was acquitted on the second count of the indictment which charged interstate transportation of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g).

with a pistol grip." It further related as follows:

"Prior to March 1, 1972, I received information which I believed from an informant who had in the past furnished reliable information that Clyde Jenkins had a M–1 Carbine with a pistol grip in the trunk of his black and white Pontiac Grand Ville. Clyde Jenkins is a man known to me as a convicted felon who has been convicted of narcotics and liquor violations. On March 1, 72 I received information which I believed from an informant who had in the past furnished reliable information that Clyde Jenkins had an Enforcer (a .30 cal carbine with a pistol grip) in his possession and the informant further stated the gun came from a burglary in Kansas. During the week of March 6, 1972, I received information which I believed from an informant who had in the past furnished reliable information that Clyde Jenkins was armed and had access to a gun at all times. The informant further stated that Clyde sometimes had his wife Shirley carry his gun for him. On March 10, 1972, I received information from Asst. U.S. Atty. Larry Parrish in Memphis, Tennessee that Clyde Jenkins had been seen carrying a Colt Diamondback revolver in Memphis by a Federal Undercover Agent working under the direction of Mr. Parrish. Mr. Parrish said that he could provide a witness to testify as to Jenkin's [sic] possession of the gun. Mr. Parrish further stated that an arrest warrant would be issued for Jenkins on or about March 13, 1972 by the Federal District Court in Memphis, Tennessee."

 It is undisputed by the parties that in performing his obligation to make an independent assessment on the issue of probable cause, a magistrate may rely upon hearsay information received by an affiant from an informant.[2] It is appellant's contention, however, that the above described affidavit is faulty because it does not meet the standards enunciated in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). In the former case, which concerned a warrant based wholly upon an informer's tip, the Supreme Court set forth a "two-pronged" standard for testing the sufficiency of affidavits which contain such hearsay. The first prong requires that the magistrate be informed of some of the underlying circumstances on which the informant's conclusion was based, and the second prong requires that the affidavit show some of the underlying circumstances from which the affiant concluded that the informant (who need not be identified) was credible or his information reliable. 378 U.S. at 114, 84 S.Ct. 1509. And the latter case, *Spinelli, supra,* teaches generally that when an informer's tip is found wanting under *Aguilar,* the other allegations in the affidavit which corroborate the hearsay report should be considered, and the affidavit is to be deemed sufficient if it can fairly be said that the tip " . . . when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration". 393 U.S. at 415, 89 S.Ct. at 588.

In the case at hand, the information within Elliott's personal knowledge was limited to the fact that Jenkins had previously been convicted of a felony.[3] All of the remaining information was pro-

---

**2.** The 1972 amendments to the Federal Rules of Criminal Procedure, which became effective shortly after the time of the events here at issue added the following sentence to Rule 41(c): "The finding of probable cause may be based upon hearsay evidence in whole or in part." The Notes of the Advisory Committee on Rules describe this addition as "current law."

**3.** This information, of course, constitutes an objective datum and is fundamentally different from the simple "assertion of police suspicion" which was rejected in *Spinelli, supra,* 393 U.S. at 418–19, 89 S.Ct. 584. In any event appellant has not challenged its use here.

vided to Elliott by others, to wit: (1) "an informant" and (2) "Asst U.S. Attny Larry Parrish."

■■ Examining these sources in sequence, and taking the tips from the informant as a group, it is evident that the statements which originated with the informant satisfy the second branch of the *Aguilar* test, for the general believability of such a source may be satisfactorily established before a magistrate by the affiant's declaration that the informant has in the past given accurate information. *United States v. Kidd,* 407 F.2d 1316, 1317 (6th Cir. 1969). And, while there is nothing explicit in this portion of the affidavit which could be construed as revealing to the magistrate the means by which the informant reached his conclusions, there is a significant amount of detail which suggests personal observation and from which an independent judicial officer "could reasonably infer that the informant had gained his information in a reliable way."[4] *Spinelli v. United States, supra,* 393 U.S. at 417, 89 S.Ct. at 589.

■ We now turn to the tip first provided by a "Federal Undercover Agent," and relayed to the affiant by an Assistant United States Attorney in Memphis, Tennessee. In attacking this portion of the affidavit appellant's principal claim is that as "double hearsay" it is somehow *per se* ineligible to be considered in a probable cause determination. We disagree, and hold that, subject to the Supreme Court's criteria outlined above, hearsay upon hearsay may be so considered by a magistrate. *United States v. Kleve,* 465 F.2d 187, 191–93 (8th Cir. 1972); *United States v. Smith,* 462 F.2d 456, 459–60 (8th Cir. 1972).

■ Alternatively, Jenkins asserts that the hearsay conveyed to the affiant by an Assistant U.S. Attorney did not meet constitutional standards with respect to the originator of the information. In our view, the declaration that the original source was an eyewitness to the event described provides a sufficient basis for validating the conclusion conveyed in the tip (the first branch of the *Aguilar* test). On the other hand, we recognize that the description of the original source as a "Federal Undercover Agent working under the direction of Mr. Parrish," is not a precise one and would not compel a magistrate to find in favor of the source's general believability (the second branch of the *Aguilar* test), but we believe that it could have a tendency to do so.[5]

■ In light of this discussion, we do not hesitate to say that the affidavit here at issue is considerably less than ideal. However, in determining whether a search warrant should issue, the magistrate deals only with probabilities rather than certainties. *Draper v. United States, supra,* 358 U.S. at 313, 79 S.Ct.

---

**4.** This was essentially the situation in *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), cited with approval in *Spinelli,* 393 U.S. at 416, 89 S.Ct. at 589, in support of the following proposition:

"In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation."

*Draper* had the additional feature that the particulars provided by the confidential informant were confirmed by independent police surveillance of the suspect involved.

**5.** The identity of the "Agent" was not put at issue by defense counsel at the hearing on the motion to suppress. In his brief, appellant asserts that the "Agent" was in fact one Robert Thurston Davis, a principal witness at the trial and a "criminal who was turning evidence for the government," rather than a government employee as the appellation "Agent" might imply. We believe, that even if the words "Federal Undercover Agent" were discounted entirely and the source were treated simply as an informant, working under the direction of Mr. Parrish, our ultimate conclusions as to general believability and the lawfulness of the search would not be affected; and, therefore, we need not reach the issue of misrepresentation by the government which Jenkins impliedly raises before this Court.

329, and deference is to be accorded an independent judicial officer's finding of probable cause, with doubtful cases governed largely by the preference which our legal system gives to warrants. *Jones v. United States,* 362 U.S. 257, 270, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *United States v. Ventresca,* 380 U.S. 102, 108–109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *United States ex rel. Saiken v. Bensinger,* 489 F.2d 865, 866 (7th Cir. 1973), *cert. denied,* 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974). Moreover, the Supreme Court has stated that its decisions in *Aguilar, supra,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 and other cases on this subject

" . . . reflect the recognition that the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a common-sense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts towards warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." *United States v. Ventresca, supra,* 380 U.S. at 108, 85 S.Ct. at 746.

■ We conclude that the tips here at issue adequately, if marginally, meet the standards expressed in *Aguilar v. Texas, supra,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723, as explicated in *Spinelli v. United States, supra,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637, and were properly includable in the probable cause calculus along with the affiant's personal knowledge of Jenkins' felony record. And, mindful of our obligation to eschew the "totality of the circumstances" approach to this problem condemned in *Spinelli, supra,* 393 U.S. at 415, 89 S.Ct. 584, we are still convinced that the declarations in the affidavit were sufficient to permit a neutral magistrate to find that weapons which were evidence of a crime would probably be found at appellant's residence. Accordingly, the motion to suppress was correctly denied.

## II. Evidentiary Rulings

Jenkins' second contention is that an official prison record which was read, in part,[6] to the jury and an Enforcer firearm which was also admitted into evidence were unduly prejudicial or unnecessarily cumulative in nature or both. However, it is important to note that much of the other evidence presented to the jury was in the form of tape recordings and the two items here complained of were received for the limited purpose of identifying a speaker on the tape who made statements concerning a prison term he had spend at Fort Leavenworth and an Enforcer weapon which he owned.

■ In overseeing the presentation of evidence to a jury, a District Judge must, in the exercise of his sound discretion weigh probative value against the possibility of undue prejudice to the defendant. On appeal, evidentiary rulings will be disturbed only in the event of a grave abuse of discretion, *United States v. Wright,* 160 U.S.App.D.C. 57, 489 F.2d 1181, 1186 (1973), and upon the record before us we find no such abuse.

## III. Testimony of Government Witnesses

Thirdly, in the same vein as his second contention, Jenkins argues vigorously that two instances of testimony by

---

**6.** The form related the length of Jenkins' sentence at Leavenworth, Kansas, on a prior conviction; but the nature of the underlying offense was not revealed to the jury.

Government witnesses on direct examination amounted to "character assassination" and "insinuation of criminal activity other than that referred to in the indictment." The first such instance occurred when a federal agent testified that the weapon which was the subject of Count II of the indictment was discovered in a flight bag which also contained "miscellaneous tools" as well as "some gloves and ski masks." (Tr. 349). This testimony was the subject of the following colloquy at the bench out of the hearing of the jury:

MR. FRIEDMAN [Defense Counsel]: I don't know what they purpose of that last comment [sic], Mr. Parrish [Government counsel] knew that information was going to come out, and I object to it, I am very unhappy about it.

THE COURT: What do you want me to do?

MR. FRIEDMAN: Well, I'm about halfway tempted to ask for a mistrial, this is prejudicial and improper, he knows what is coming out, this is to prejudice the jury about this man being involved in some other crimes, and it has no probative value to this particular inquiry, and I think it is a deliberate attempt to prejudice this man's rights in front of this jury.

MR. PARRISH [Government Counsel]: For the record—

MR. FRIEDMAN: I would ask the Court to admonish Mr. Parrish not to let it happen again.

THE COURT: Mr. Friedman, I don't believe that Mr. Parrish did that. Whether he knew it I can't say, but he asked whether there were any clothes in the bags and the witness brought this out. I don't know whether he knew or not. Let's—

MR. FRIEDMAN: Your Honor, a lawyer won't ever put a witness on that he didn't know what he would testify to.

THE COURT: I've seen that happen by the government and defense both.

MR. FRIEDMAN: I know for the government—

THE COURT: Mr. Friedman, let him make a statement for the record.

MR. PARRISH: For the record, as an officer of this court, I can state that I had no knowledge anything about ski masks would come out. I didn't know any black leather bags. I knew this gun and holster was found in the residence, and when I asked and he said black leather bags I was inquiring [sic] to see if they were traveling type bags and if there was clothing in them. However, ski masks are nothing more than clothing, and I think the jury is not likely to be prejudice [sic] by the fact that there was ski masks there and they may think he was going skiing.

MR. FRIEDMAN: I have made my motion.

THE COURT: I'm not going to admonish Mr. Parrish, and I don't have anything else before the Court.

MR. FRIEDMAN: I want the Court to have my impression of the credibility of the last statement.

THE COURT: All right.

(Tr. 350–51).

▇▇▇ A fair reading of this exchange is that no motion to strike the agent's testimony was made despite the fact that the Court afforded the defense ample opportunity to do so. Moreover, in light of the circumstances, we believe that even if an admonishment should have been made or if reference to items other than the gun in the flight bag should have been stricken, the error in not doing so was harmless. Fed.R. Crim.P. 52(a).

The second instance of testimony here assigned as error need not be discussed in detail, except to say that it comprised brief mention by witness Cordelia Stone of Jenkins' association with narcotics transactions other than those involved in the instant indictment. Appellant's brief indicates that a motion to strike this testimony was made, but the record shows that it was brought up belatedly at a

bench conference during the testimony of the second witness to take the stand after Mrs. Stone had been excused.[7] Despite its manifest untimeliness, the District Judge entertained the motion and overruled it on the ground that the testimony showed "willingness and intent to join this conspiracy that he [Jenkins] is charged with in Count I." (Tr. 435).

 It is true, of course, that, as a general matter, evidence of misconduct not charged in an indictment is not admissible at trial, but, where, as here, such evidence tends logically to prove an element of the offense charged, an exception is made to the general rule. *Grant v. United States,* 255 F.2d 341, 342 (6th Cir. 1958), *cert. denied,* 358 U.S. 828, 78 S.Ct. 48, 3 L.Ed.2d 68 (1958). We believe that the District Judge's disposition of appellant's motion to strike was an appropriate application of this exception.

### IV. The Informer

The Government's principal witness at trial was Robert Thurston Davis, a convicted felon with a long criminal record, who, after being arrested on another charge, revealed to the Federal Bureau of Investigation that he had participated in certain criminal activities then under investigation. In return for protection and financial support, (Tr. 122 and 1222) Davis agreed to cooperate with law enforcement officials in investigations then being conducted, and in so doing, he performed a variety of functions which included living in an apartment (provided by the Government) (Tr. 122) which he knew to be under photographic and electronic surveillance and wearing a radio apparatus strapped to his body for the purpose of transmitting his conversations with criminal suspects. It was from the radio and other electronic devices that the tape recordings used as evidence in this case were derived.

During the course of his direct and cross-examination, the jury was made fully aware of these and many other detailed facts about Davis' background and his dealings as an informer.

On appeal, Jenkins urges that Davis' testimony was tainted because he had been shown to be a "pathological liar" and that the Government was guilty of bad faith in using such a witness.

 The record indeed shows that in a prison psychological report prepared some nine years before the trial in this cause, Davis was described as an antisocial personality and a pathological liar, but the record also shows that the report was voluntarily brought to the attention of the trial judge by the prosecution (Tr. 796) and that it was made available to the defense and later admitted into evidence as an official record at the urging of the defense (Tr. 1185) over the objection of the Assistant United States Attorney (Tr. 797, 1426–27). Moreover, appellant's expert witness, a physician and psychiatric resident, was permitted to define extensively for the jury the medical terms used in the report, and he testified, *inter alia,* that a pathological liar "lies as part of his life style." (Tr. 1464).

 We conclude that appellant's broadside allegations of prosecutorial misconduct are unfounded and that evaluation of Davis' testimony was a matter of credibility for the trier of fact. *See e. g., United States v. Hoffa,* 349 F.2d 20, 38 (6th Cir. 1965), *aff'd* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

### V. Voiceprint and Polygraph Evidence

The last assignment of error relates to the District Judge's rulings on admissibility of voiceprint and polygraph evidence; the former, proffered by the Government, was admitted, while the latter, proffered by the defense, was not. Appellant's basic positions are: (1) that voiceprint analysis is so unreliable as to be inadmissible, but (2) since it was ruled admissible below, the District Court should have admitted the tendered poly-

---

7. The motion appears in the transcript more than 20 pages after Mrs. Stone's testimony ended. (Tr. 433).

graph evidence as well. We disagree with the first proposition and, in light of the nature of the defense tender, need not reach the second.

The voice identification put at issue by appellant was made by Lt. Ernest W. Nash of the Michigan State Police, who compared voiceprints [8] derived from tape recordings of an unknown speaker with voiceprints derived from a taped voice exemplar given by Jenkins and concluded that, in his opinion, the unknown speaker was Jenkins. (Tr. 262–63).

 This Court has recently held that voiceprint analysis falls into the category of scientific evidence and that its admissibility is a matter within a trial judge's discretion. *United States v. Franks,* 511 F.2d 25, 33 (6th Cir. 1975). Applying that standard to the instant case, we hold that the District Court committed no error, for, as in *Franks,* the expert here was accepted as such only after an extensive inquiry into his qualifications and the reliability of the scientific process which he used. The record before us makes it clear that the required foundation was properly laid and that Lt. Nash's background and training, as well as the accuracy of the voiceprint method of analysis were subjected to detailed scrutiny on lengthy direct examination and on rigorous cross-examination. Having heard the expert testify, the jury was entitled to weigh the voice identification evidence along with other evidence properly received.

As a final matter, it is sufficient to say that appellant's arguments concerning admissibility of polygraph (lie detector) evidence need not be considered, since the defense proffer was, by its terms, directed solely to Count II of the indictment (the firearms count) on which the jury returned a verdict of not guilty. (Tr. 1373–74).

Accordingly, the judgment of the District Court is affirmed.

---

8. Lt. Nash testified that the technique known as sound spectrography or voiceprint analysis involves use of an electronic device (spectrograph) which, when activated by a human voice, produces graphic representations of the unique accoustical characteristics of that voice. The graphs are traced on paper by a stylus and are called "voiceprints" or, more formally, "spectrograms." Comparison of spectrograms is used as a basis for determining whether or not the accoustical patterns of an unknown voice match those of a known speech sample.