Maxe Colleen McCorkle MORRIS,
Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 84–1267.

United States Court of Appeals,
Sixth Circuit.

Argued March 4, 1985.

Decided May 20, 1985.

Louis Salmon (argued), Charles E. Richardson III, Michael I. Spearing, Watts, Salmon, Roberts, Manning and Noojin, Huntsville, Ala., for petitioner-appellant.

Fred T. Goldberg, Jr., Chief Counsel, I.R.S., Glenn L. Archer, Jr., Asst. Atty. Gen., Tax Div., U.S. Dept. of Justice, Michael L. Paup, Jonathan S. Cohen, Laurie A. Snyder (argued), Washington, D.C., for respondent-appellee.

Before WELLFORD and MILBURN, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

MILBURN, Circuit Judge.

Maxe Colleen McCorkle Morris appeals the tax court's decision that she owes additional taxes to the Commissioner of Internal Revenue Service ("Commissioner") based on the valuation of her deceased father's estate pursuant to the Internal Revenue Code of 1954, 26 U.S.C. § 2001 *et seq.* For the reasons that follow, we affirm.

## I.

James B. McCorkle, decedent and father of petitioner, died testate on November 19, 1972, leaving an estate which included a four hundred eighty-eight (488) acre family farm located in Clay and Platte Counties, Missouri, which he and petitioner owned as joint tenants with right of survivorship. His estate valued the farm at Three Hundred Thirty-two Thousand, One Hundred Fifty-one Dollars ($332,151.00) or Six Hundred Eighty Dollars ($680.00) per acre. The Commissioner assessed a value of One Million, One Hundred Twenty-two Thousand Dollars ($1,122,000.00) or Two Thousand, Two Hundred Ninety-nine Dollars ($2,299.00) per acre.

On February 7, 1977, the petitioner ("taxpayer"), as transferee of the subject real estate brought this action in the tax court seeking a redetermination of a federal estate tax deficiency asserted against her in the amount of Three Hundred Seventy-six Thousand, Five Hundred Thirty-Five and 25/100 Dollars ($376,535.25). The tax court found, based on all the evidence before it, that the subject real estate had a fair market value of Nine Hundred Ninety Thousand Dollars ($990,000.00) or Two Thousand, Twenty-Eight Dollars ($2,028.00) per acre on November 19, 1972, the date of James B. McCorkle's death. Furthermore, the tax court found "[t]he highest and best use for the subject property was as agricultural land for between 8 and 15 years, with subsequent development primarily of a residential nature, including multi-family dwellings, and a limited amount of commercial development."

The subject real estate consists of two (2) land tracts both within the northern city limits of Kansas City, Missouri. The larger tract ("Home Place") is three hundred forty-seven (347), acres, is rectangular in shape, and has frontage on its north side of approximately twenty-one hundred (2100) feet on State Highway 291. It also has frontage on Baugham Road on its west side and on 108th Street on its south side. The smaller tract ("Main Street Property") is one hundred forty-one (141) acres and has nearly two thousand (2,000) feet of frontage on its west side on a gravel road known as Main Street.

On the date of decedent's death, the subject property was zoned Agricultural Reserve, and had electric and telephone service but did not have gas, water, and sewage service. The nearest water line to the larger tract was located on the north side of Highway 291, but there was no water line adjacent to the smaller tract. Even though there were no sewers, a sanitary sewer easement had been obtained near the east side of the smaller tract and plans called for a sewer to be available by late 1974. However, no plans existed for sewers to service the larger tract. There were several improvements, including a main house, two tenant houses and several outbuildings, such as sheds, garages and barns.

Although the area in which the property is located was sparsely developed at the time of the decedent's death, some residential and commercial development did exist nearby. An old community of modest homes was located approximately one-half mile to the east of the larger tract and a larger, planned development was located approximately two miles to the southeast of the larger tract. The Kansas City International Airport was located five miles west of the subject property, and the central business district of Kansas City was located fifteen miles due south of the subject property.

Significant roadways and the site for the planned construction of a major interstate were located close to the property. Highway 291, a primary east-west roadway that ran between the two tracts and along the northern border of the larger tract, proceeded due west to the main entrance of the airport. An expressway designated U.S. 169, which proceeded straight southward to the downtown area of Kansas City, was located approximately one-half mile to the east of the larger tract and west of the smaller tract. A proposal to extend Interstate 435, well-publicized in late 1968 and early 1969, was adopted by the City Council of Kansas City on December 11, 1970. According to the proposal and adopted plans for the extension nearest to the property, I–435 was to proceed straight west, paralleling Highway 291 approximately one-fourth mile to the north, and crossing over Highway 291 at a point near to the northwest corner of the larger tract. A diamond interchange was planned at this junction, and a full cloverleaf was planned at the junction of U.S. 169 and I–435.

At the trial which was conducted on November 18 and November 19, 1980, taxpayer presented the appraisal reports and testimony of two expert witnesses, William D. Davis, Jr., and James L. Sawyers, both of whom had been in the appraisal business for over twenty years, had taught courses in the field of appraising, and had their MAI designations from the American Institute of Real Estate Appraisers.

Taxpayer's first expert witness, Mr. Davis, determined that the fair market value of the subject real estate as of the date of the decedent's death (November 19, 1972) was Six Hundred Seventy Thousand Dollars ($670,000.00). His appraisal report is dated December 22, 1975. Mr. Davis used and gave consideration to the values indicated by the cost, income, and market data methods of appraisal to determine the value of the subject property. In using the cost approach, he estimated the value of the subject property's bare land by analyzing by reference to comparable sales of vacant land in the area. Similarly, in using the market data approach, he considered recent sales of properties that had some of the same features as the subject property. In using both the cost and market value approaches, Mr. Davis made adjustments to the actual sales prices of comparable properties for, among other things, "the impact of a quick sale" and "the impact of a potential interchange on Highway 291."

A summary of Mr. Davis' explanation of the adjustments that he considered appropriate on account of a "quick sale" is as follows: First, he reasoned that the marketing period for urban fringe property like the subject property "requires either a speculator or developer buyer, and the usual marketing period may well be from two to three years." He then stated that "[i]t is customary to settle up an estate with the payment of inheritance taxes, within one year of [the] date of death or shortly thereafter." He then sets forth his "study" comparing sales occurring "quicker than normal * * * or within one year of the date of death versus two or three years—a normal holding and marketing period." His study then compared sales by two estates in the vicinity of the subject area, which Mr. Davis stated were "necessary" sales, to sales of other property in the area. From this study he concluded that the disadvantage attributable to the customary quick sale by an estate is fifteen percent (15%), and made a corresponding negative adjustment to the comparable sales of property in the area.

By analyzing several sales of properties in which the buyers could have expected the properties to be influenced by an interchange along I–435 when the construction of the highway was completed, Mr. Davis determined adjustments for the impact of potential interchanges. He compared the prices at which those properties sold to the prices at which properties sold that were not as near to an interchange, but were located along Highway 291. In three instances, his analysis indicated that he considered a certain portion of tracts of land as being affected by an interchange, and the remainder of the tracts as not being so affected. Two tracts of land that Mr. Da-

vis used in his analysis to indicate the lower prices at which properties not influenced by an interchange were selling were located several miles to the east of U.S. 169. As a result of his analysis, Mr. Davis concluded that when a sale of property near an interchange was compared to a sale of property located on Highway 291, "a negative adjustment of approximately two-thirds" was indicated.

Notwithstanding his determination that the subject property was worth two-thirds less than property near an interchange, Mr. Davis noted that the interchanges at I–435 and U.S. 169, and U.S. 291 and I–435, "provide good access" to the larger tract. Moreover, Mr. Davis estimated that the property would be developed into residential and commercial usage "from 10 to 15 years in the future," and he also attributed a fifteen per cent (15%) increase per year to land values in the vicinity of the property.

Taxpayer's second expert witness, Mr. Sawyers, determined that the fair market value of the subject real estate at the date of the decedent's death was Six Hundred Forty-Six Thousand, Six Hundred Dollars ($646,600.00) or One Thousand, Three Hundred Twenty-five Dollars ($1,325.00) per acre. His appraisal report is dated April 13, 1978, and Mr. Sawyers employed both the cost and market data methods of appraisal, using the value indicated by the latter approach as his "final value conclusion."

In arriving at his determination of the fair market value of the subject property, Mr. Sawyers compared it to six parcels of real estate which had been sold in the surrounding vicinity during the five years previous to the decedent's death (November 19, 1972). He adjusted the sales prices of the comparable sales for differences in factors such as size, time of sale (an increase of three percent (3%) per year), and improvements on the property. Additionally, he made adjustments for the following factors: (1) a twenty percent (20%) to twenty-five percent (25%) discount for the lower price at which the property would be sold,

in his view, if it were sold for cash, rather than on a contract or on the installment method as the comparable properties had been sold, and (2) a discount of Eight Hundred Dollars ($800.00) per acre for the lower price at which the property would have been sold, in his judgment, on account of the absence of an interchange crossing the property. Mr. Sawyers derived the figures that he used to make an adjustment for the "difference between a contract and [a] cash sale" in virtually the same manner as Mr. Davis derived his adjustment for a "quick sale." That is, he compared other sales in the area of the property to the sales, which were cash sales, made by the two estates in the vicinity.

The Commissioner presented the appraisal and testimony of one expert witness, Thomas Rule, whose office was located approximately five miles from the subject property. Like Mr. Davis and Mr. Sawyers, Mr. Rule had been engaged in the real estate appraisal business for over twenty years, had taught appraisal courses, and had received his MAI designation from the American Institute of Real Estate Appraisers.

In his appraisal report, dated February 19, 1975, Mr. Rule determined that the fair market value of the subject property at the date of the decedent's death was One Million, One Hundred Twenty-two Thousand Dollars ($1,122,000.00). Although he used a market data approach and a summation (or cost) approach to arrive at this value, he determined that the market data approach provided a better indication of the subject property's value because the summation approach requires the appraiser to "estimate the amount of depreciation that has occurred to rather extensive improvements," which is difficult to do. To determine the fair market value of the subject property under the market data approach, Mr. Rule examined thirteen comparable sales and relied principally on three of those sales. He made adjustments to the sales prices of the three comparable properties for size, location, topography, and improvements. In addition, based on his

analysis of "paired sales," that is, sales of the same property at two points in time, Mr. Rule, like Mr. Davis, made a positive adjustment of fifteen percent (15%) per year for the increase in land values over time.

However, unlike Mr. Davis, who adjusted the prices of comparable sales for "quick sales," and Mr. Sawyers, who made similar adjustments for "cash sales," Mr. Rule made no adjustments for the "circumstances" of the sales he used as comparisons, having determined that each of the sales he used as a comparison was "a free market transaction with no undue pressure on either party and no unusual financing."

At the trial on November 18 and again on November 19, 1980, taxpayer offered to prove that as of those dates, the area in which the subject property was located was still undeveloped, and that during the interval between the valuation date, November 19, 1972, and the date of trial, the thirteen properties used as comparisons by Mr. Rule in his appraisal report had not been resold, but some had been foreclosed upon. Taxpayer contended that such evidence was relevant for two reasons: (1) to show that the sales used as comparisons by "many if not all of the appraisals" were speculative, and, therefore, should have been discounted to arrive at "true market value," and (2), to prove incorrect Mr. Rule's prediction of February 19, 1975, that the area would develop residentially and commercially in the following 8 to 10 years. The tax court, however, refused to permit taxpayer to introduce evidence in support of her offer of proof, concluding such evidence to be too remote from the valuation date.

The tax court held that in determining "fair market value," no adjustment should be made on account of any "speculation." Moreover, as earlier stated, the tax court found that the "highest and best use for the subject property is as agricultural land for between 8 and 15 years, with subsequent development primarily of a residential nature." The court based this finding not only on Mr. Rule's prediction that

the property would be developed in 8 to 10 years, but also on the prediction of taxpayer's expert witness, Mr. Davis, that development would occur in 10 to 15 years.

With regard to the appraisals, the Court rejected the adjustments made by Mr. Davis and Mr. Sawyers for a "quick sale" and "cash sale," respectively. The court found that in making these adjustments, the appraisers inappropriately assumed that a sale attributable to economic necessities, in the form of estate taxes, was facing the estate of the decedent. Moreover, although the court agreed with the conclusion of taxpayer's experts that the value of the land adjoining the proposed interchanges was enhanced as a result of the expectation that commercial development would occur near the interchanges, the court found that the evidence did not support negative adjustments as great as those made by them. The court found that the fifteen percent (15%) adjustment per year made by Mr. Rule and Mr. Davis for the increase in the values of property over time was appropriate, and that the adjustments Mr. Rule had made for the differences in utilities between the subject property and the comparable properties were correct. The court, however, found that in making his appraisal, Mr. Rule had failed to make an adjustment to convert the terms of the owner financing of comparable sales into institutional financing (or cash sales). In addition, the court found that Mr. Rule had failed to take into account the fact that the Main Street property was slightly less valuable than the Home Place property. Taking all of these factors into consideration, the tax court determined that the property had a fair market value as of November 19, 1972, of Nine Hundred Ninety Thousand Dollars ($990,000.00).

**II.**

Petitioner argues: (1) the tax court erred, as a matter of law, in relying upon speculative real estate transactions to determine the value of the subject real estate as of November 19, 1972, without adjusting them for the speculative market that exist-

ed in and around the subject farm at that time; and, (2) the tax court erred, as a matter of law, in repeatedly denying petitioner's attorney the opportunity to cross-examine the Commissioner's appraiser, Thomas Rule, on his opinion that the subject farm would develop within 8 to 10 years and in refusing to permit taxpayer to introduce evidence that the subject farm and surrounding area had not developed as predicted by Mr. Rule.

### A.

Section 2031(a) of the Internal Revenue Code of 1954 requires that the gross estate of a decedent include the value of all property owned by the decedent at the time of death.[1] Property includable in a decedent's gross estate is to be included at its "fair market value at the time of the decedent's death." Treasury Regulations on Estate Tax (1954 Code), § 20.2031–1(b). Fair market value is measured by what a willing buyer would pay a willing seller when neither is under any compulsion to buy or sell the property and both are reasonably informed as to all relevant facts. *Id.*

 Although "[t]he criterion to be applied in determining value is a matter of law," *Ruehlmann v. Commissioner*, 418 F.2d 1302, 1304 (6th Cir.1969), *cert. denied*, 398 U.S. 950, 90 S.Ct. 1869, 26 L.Ed.2d 290 (1970), the determination of the fair market value of certain property on a given date is a factual one and should not be reversed on appeal unless clearly erroneous. *Ohio Teamsters Educational & Safety Training Trust Fund v. Commissioner*, 692 F.2d 432, 435 (6th Cir.1982); *Gamble v. Commissioner*, 101 F.2d 565, 567 (6th Cir.), *cert. denied*, 306 U.S. 664, 59 S.Ct. 790, 83 L.Ed. 1061 (1939); *Estate of Frieders v. Commissioner*, 687 F.2d 224, 226 (7th Cir.1982), *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1251, 75 L.Ed.2d 480 (1983).

*See also Estate of Shafer v. Commissioner*, 749 F.2d 1216, 1218 (6th Cir.1984).

 In the case *sub judice*, the tax court found that in determining the fair market value of property, market prices should not be discounted or disregarded due to the allegedly speculative nature of the market. In noting taxpayer's argument to the contrary, we have also noted that the decedent's estate reported the value of the subject property at Three Hundred Thirty-two Thousand Dollars ($332,000.00), when taxpayer's own experts appraised its value at Six Hundred Forty-Six Thousand Dollars ($646,000.00) and Six Hundred Seventy Thousand Dollars ($670,000.00), or nearly twice as high. As stated by the Court of Claims in *Campbell v. United States*, 661 F.2d 209, 221, 228 Ct.Cl. 661 (1981), "speculative excesses [are] a part of the market's dynamics.... [O]ne cannot reject a market price because of its presumed unfounded optimism without rejecting, at the very same time, the essence of the market concept itself." *See also Amerada Hess Corp. v. Commissioner*, 517 F.2d 75, 84 (3d Cir.), *cert. denied*, 423 U.S. 1037, 96 S.Ct. 574, 46 L.Ed.2d 412 (1975).

Moreover, as stated in *Frieders, supra:*
[T]he fact that there was investment activity does not in itself make the nearby sales not comparable. The lack of investment activity is not a prerequisite to having "willing sellers." The only guidance the applicable regulation gives in defining an unwilling seller is this statement: "The fair market value ... is not to be determined by a forced sale price." Treas.Reg. § 20.2031–2(b). The sales near the Frieders farm certainly did not involve "unwilling sellers" in the sense that there was a forced sale. Likewise, one cannot say that the people involved in the sales near the Frieders farm were literally "under any compulsion to buy or

---

**1.** Pursuant to Section 2040 of the Internal Revenue Code (26 U.S.C.), and Section 20.2040–1(a)(2) of the Treasury Regulations on Estate Tax as in effect in 1972, the entire value of jointly held property is includable in the estate of the first joint tenant to die, except such part of that value as is attributable to the consideration in money or money's worth furnished by the other joint owner. Taxpayer stipulated that she paid no consideration to the decedent in exchange for her interest in the property. Accordingly, the entire value of the property is includable in the decedent's gross estate.

to sell." *Id.* There may be a question as to whether an "unwilling seller" exists only in a forced sale situation. *See 429.-59 Acres of Land,* 612 F.2d [459] at 462 [9th Cir.1980] (a willing seller is one who "desires" to sell), but we would not call a property owner an "unwilling seller" simply because his property has development potential due to its proximity to a proposed freeway.

687 F.2d at 227.

Further, in *Frieders* as in the case *sub judice,* the tax court found that the highest and best use of the subject farm "was a speculative, that is, an investment use." *Id.*

After reviewing the entire record herein, we cannot say that the tax court erred in determining the fair market value of the subject real estate on the date of decedent's death or that its decision as to its value is clearly erroneous.

### B.

Petitioner's remaining argument is that the tax court erred because it denied petitioner's attorney the opportunity to examine the Commissioner's appraiser, Mr. Rule, and other witnesses on the lack of development of the subject property and the surrounding area from the date of the decedent's death in 1972 until the trial in 1980. Petitioner argues that such evidence was relevant to substantiate the speculative nature of the market and to test the credibility of the appraiser.

In *Walter v. United States,* 341 F.2d 182, at 185 (6th Cir.1965), this court stated:

It also must be kept in mind that the measure of the tax must be determined according to the situation as it existed on the date of the death of the decedent, and not according to subsequent events, "[t]empting as it is to correct uncertain probabilities by the now certain fact * * *." *Ithaca Trust Co., Executor v. United States,* 279 U.S. 151, 155 [49 S.Ct. 291, 292, 73 L.Ed. 647] [ (1929) ].

■ In this connection, it should be noted that with regard to the tax court's interpretation and application of the Federal Rules of Evidence, an abuse of discretion standard is applied. *E.g., United States v. Stone,* 702 F.2d 1333, 1340 (11th Cir.1983); *United States v. Medel,* 592 F.2d 1305, 1314 (5th Cir.1979); *United States v. Jenkins,* 525 F.2d 819, 824 (6th Cir.1975).

In his February 19, 1975, appraisal report, the Commissioner's appraiser, Mr. Rule, stated that the subject property was "capable of being developed within 8 or 10 years." Taxpayer's own appraiser, Mr. Davis, predicted that development would occur in 10 to 15 years. In determining the fair market value of the subject property, the tax court adopted a prediction of 8 to 15 years.

■ Considering that the trial occurred approximately eight years after the valuation date (November 19, 1972) and even assuming as fact that no development may have occurred in the eight years following the decedent's death does not prove Mr. Rule's statement incorrect or that his prediction was unreasonable when it was made. Accordingly, the tax court did not abuse its discretion in refusing to permit the introduction of evidence concerning the state of development eight years after the valuation date.

The case of *Estate of Jephson v. Commissioner,* 81 T.C. 999 (1983), cited in support of taxpayer's position, does not alter our holding because it stands for the principle that subsequent events may only be considered if they were reasonably known on the date of valuation and also that such could be reasonably contemplated on that date. *See id.* at 1002 (quoting *Couzens v. Commissioner,* 11 B.T.A. 1040, 1165 (1928)).

### III.

In sum, we hold that under the circumstances of this case, the tax court did not err in determining the fair market value of the subject real estate and that its findings as to the market value are not clearly erroneous. Further, the tax court did not abuse its discretion in refusing to consider

the evidence of subsequent events. Accordingly, the judgment of the tax court is AFFIRMED.