966 F.2d 1455
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ron LEON, Jr., Defendant-Appellant.
 No. 90-6571.
 United States Court of Appeals, Sixth Circuit.
 June 12, 1992.
 
 Before KEITH and ALAN E. NORRIS, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant, Ron Leon, Jr., appeals from his conviction for possession with intent to distribute the Schedule I controlled substance methylene-dioxymethamphetamine, commonly known as "Ecstasy," in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and conspiracy to possess with intent to distribute that drug in violation of 21 U.S.C. § 846. Defendant argues that the district court erred in allowing expert voice identification testimony to link him to inculpatory statements recorded from a phone conversation with an alleged co-conspirator. He also argues that the district court erred in admitting evidence concerning prior drug dealings, in allowing the government to cross-examine him about those dealings, and in requiring him to assert his privilege against self-incrimination on these questions in front of the jury. For the reasons that follow, we affirm the conviction.
 
 I.
 
 2
 Prosecution witness Damon Young testified that he received $1,000 from co-conspirator Stacy Brown and gave it to defendant to purchase Ecstasy to sell to another man. On October 27, 1988, a Federal Express courier in Memphis, Tennessee, attempted to deliver a package addressed to "Steve Smith" at 3717 Marion, but the person at the receiving address refused delivery. After attempting to contact the shipper and recipient, the Federal Express manager in Memphis opened the package and discovered suspicious-looking capsules that turned out to be Ecstasy, along with a note to "Ron" providing information concerning "dosages."
 
 
 3
 After being notified, the Shelby County Sheriff's Department directed a controlled delivery. Someone identifying himself as Steve Smith called to have the package redelivered to an address on Poplar Pike in Memphis, but delivery to that address was also unsuccessful.
 
 
 4
 Young testified that on October 28, 1988, following the incomplete delivery attempts, defendant phoned to advise him that the package of Ecstasy had arrived, but told Young that he expected "a bust," and therefore Young would have to pick up the package himself and bring it to defendant unopened. Young was told that there would be a note inside the package for defendant. Defendant gave Young the control numbers needed to obtain the package, and Young sent Brown and Jerry Doyle to pick it up; the two men were arrested at the terminal while attempting to pick up the package. During the following week, Young was interviewed by the sergeant running the controlled delivery, and provided a statement concerning his involvement in the transaction, as well as that of co-conspirators.
 
 
 5
 Young testified that on October 29, 1988, the day following the arrest of Brown and Doyle, he returned a call from defendant and recorded it on his answering machine. The tape that Young claimed contained a recording of that conversation was played for the jury. The tape implicates Young and the other party in the drug deal at issue, including a discussion of the failed attempts to obtain the package.
 
 
 6
 Defendant claimed at trial that the other voice on the tape was not his, and put on a witness who asserted that defendant's voice was similar to Stacy Brown's. However, Dr. Harry Hollien, a phonetic sciences expert originally retained by defendant, testified for the government that based upon his "aural perceptual analysis" technique he was able to determine that the voice on Young's tape was in fact that of defendant. This testimony was permitted over the objection that Dr. Hollien's technique was not accurate enough to justify the admission of his expert testimony.
 
 
 7
 The government also called several witnesses to testify about aspects of defendant's past involvement in drug dealing in order to link various statements on the tape, concerning the speaker's history of drug involvement, to defendant in order to show that he was the person speaking to Young.
 
 
 8
 The district court denied defendant's motion in limine to prevent the government from cross-examining him about the evidence of his past drug involvement. The court also ruled that if defendant chose to assert his Fifth Amendment privilege against self-incrimination on such questions, he had to do so in the presence of the jury.
 
 
 9
 Defendant took the stand and denied the allegations in the indictment and denied participating in the recorded October 29 telephone conversation with Young. He stated that he had no involvement with the Ecstasy transaction at issue in this trial, but, when asked on direct examination whether he would have stated, in the past, that he had no involvement with Ecstasy, he answered "maybe not." When asked on cross-examination to clarify this response and state whether he had ever bought or sold Ecstasy, he refused to answer. He also refused to answer when asked whether the witnesses testifying about his past drug involvement were lying.
 
 II.
 
 10
 A. Admissibility of Expert Voice Identification Testimony
 
 
 11
 Dr. Hollien testified that, using "aural perceptual analysis," he was able to identify the voice on the tape of the incriminating October 29 telephone conversation as that of defendant. The admissibility of expert opinion is governed by Fed.R.Evid. 702, set out at the margin.[1] Determination of the permissible limits of expert testimony is left to the sound discretion of the trial court, and the decision to permit expert testimony will not be disturbed on appeal unless it is "manifestly erroneous." United States v. Green, 548 F.2d 1261, 1268 (6th Cir.1977); United States v. Brown, 557 F.2d 541, 556 (6th Cir.1977).
 
 
 12
 In Green, this court adopted four criteria for reviewing trial court decisions concerning expert testimony: this court must determine whether there was (1) a qualified expert; (2) testifying on a proper subject; (3) in conformity to a generally accepted explanatory theory; (4) with probative value of the testimony outweighing its prejudicial effect. 548 F.2d at 1268. Defendant concedes that Dr. Hollien was a qualified expert. Defendant contends, however, that Dr. Hollien's testimony does not meet the second criterion, asserting that "aural perceptual analysis" is a merely a subjective listening procedure, and therefore Dr. Hollien's testimony invaded the province of the jury. Defendant also argues that any probative value from this testimony was outweighed by the prejudicial effect resulting from the presentation to the jury of Dr. Hollien's extensive credentials in the field, and from his testimony that his method of speaker identification is recognized as reliable in the scientific community in most countries.
 
 
 13
 A "proper subject" for expert testimony "is one that assists the trier of fact." United States v. Smith, 736 F.2d 1103, 1105 (6th Cir.), cert. denied, 469 U.S. 868 (1984). The advisory committee notes to Rule 702 state:
 
 
 14
 "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time.
 
 
 15
 (citations omitted.)
 
 
 16
 This court has pointed out that there is a clear trend in the federal courts toward the admission of expert testimony whenever it will aid the trier of fact. Brown, 557 F.2d at 556. However, this court has recognized that in the context of a criminal trial there is a strong countervailing restraint stemming from a defendant's right to a fair trial, cautioning that "[b]ecause of its apparent objectivity, an opinion that claims a scientific basis is apt to carry undue weight with the trier of fact." Id. (quoting United States v. Baller, 519 F.2d 463, 466 (4th Cir.), cert. denied, 423 U.S. 1019 (1975); see also Green, 548 F.2d at 1268, (" '[s]cientific or expert testimony particularly courts the ... danger [of undue prejudice or of confusing the issues or misleading the jury] because of its aura of special reliability and trustworthiness.' ") (quoting United States v. Amaral, 488 F.2d 1148, 1152 (9th Cir.1973)). Thus, the assistance provided by expert testimony is of dubious value where "the level of reliability of the expert testimony had not surpassed the quality of [a] common sense evaluation" which could be performed by the members of a jury. Smith, 736 F.2d at 1106. The testimony is only inadmissible under the fourth factor "where its relevance is 'substantially outweighed by the danger of unfair prejudice.' " Id. at 1107 (citation omitted).
 
 
 17
 The "aural perceptual analysis" employed by Dr. Hollien involved filtering frequencies outside the speech range from both the tape of the phone conversation at issue and the voice exemplar provided by defendant, and making comparisons of samples from each. Dr. Hollien evaluated five different natural speech characteristics of the voice on each tape: frequency (pitch) levels and patterns, voice quality, vocal intensity (variability) patterns, speech timing, and speech patterns or dialect.
 
 
 18
 The district court ruled that the testimony was admissible under the holding in United States v. Jenkins, 525 F.2d 819 (6th Cir.1975). In Jenkins, we held that the admission of expert testimony based on voiceprint comparisons (spectrography[2]) was permissible, because
 
 
 19
 the expert here was accepted as such only after an extensive inquiry into his qualifications and the reliability of the scientific process which he used.... [T]he required foundation was properly laid and [the expert witness'] background and training, as well as the accuracy of the voiceprint method of analysis were subjected to detailed scrutiny on lengthy direct examination and on rigorous cross-examination.
 
 
 20
 Id. at 827. Similarly, in the instant case, Dr. Hollien testified at length as to his extensive experience and expertise in the area of speaker identification, which is undisputed, and about the method he used and its acceptance in the worldwide scientific community.[3] He testified that in this instance the probability of success of this method, in percentage terms, was in the "high eighties," and that this method is superior to voiceprint analysis. In addition, he was subjected to a lengthy and thorough cross-examination, and was confronted with statements in articles he had written indicating weaknesses in the technique as applied in the past. Furthermore, his testimony and the technique were frontally attacked by a defense expert. That expert also testified that while the voiceprint analysis he performed on the samples could not exclude the possibility that defendant was the speaker on the tape, it could not positively identify him as that speaker. Therefore, we hold that the district court did not abuse its discretion by admitting this evidence. The shortcomings complained of by defendant go to the weight of the testimony rather than to its admissibility. See Brown, 557 F.2d at 556. Having heard the expert testify, the jury was entitled to weigh the voice identification evidence along with other evidence it had received. Jenkins, 525 F.2d at 827.
 
 
 21
 Defendant argues that this case is similar to United States v. Devine, 787 F.2d 1086 (7th Cir.), cert. denied, 479 U.S. 848 (1986), in which the trial court excluded expert testimony based on "listening skills" regarding the contents of a tape that was difficult to hear, because "understanding what is said in a tape recorded conversation is not outside the average person's understanding." Id. at 1088. However, the reviewing court merely ruled that the decision to exclude the testimony was not a "clear abuse of discretion"; it did not rule on whether it would have been an abuse of discretion to admit the testimony. Defendant also points to the fact that Fed.R.Evid. 901(b)(5) permits laypersons to testify for authentification purposes as to the identity of any voice they have heard before. However, this does not mean that expert testimony employing aural perceptual analysis is inadmissible or does not "assist[ ] the trier of fact." Smith, 736 F.2d at 1105.[4]
 
 B. Evidence of Prior Acts
 
 22
 In order to further identify the voice on the tape as that of defendant, the government introduced testimony concerning his past drug transactions to link them to statements on the tape indicating that the speaker had been "doing it for three years"; that he had an "Austin connection in Texas"; that he could get "any kind of drugs"; that he lost "a grand" one time "with somebody else, about two years ago"; and that he always used his name on the return address. The district court ruled that such evidence was permissible for the purpose of "identity" pursuant to Fed.R.Evid. 404(b), set out at the margin.[5]
 
 
 23
 Jeffrey Allen Fernandez testified that in July 1986 he was arrested for receiving a package of Ecstasy for which defendant was owed $1,000, bearing defendant's name on the return address. A San Marcos, Texas police officer testified that he arrested Mark Northcutt in September 1989 and seized an address book containing defendant's name. Northcutt testified that he met defendant in about 1985 when they both lived in San Marcos, and that on about a dozen occasions he sold defendant several types of drugs including Ecstasy. He testified that he ceased selling drugs directly to defendant after a purchase with defendant's name on the return address was confiscated, but that he continued to sell drugs to another man who in turn sold them to defendant.
 
 
 24
 Under Rule 404(b), evidence of other crimes and acts may not be admitted to prove the defendant's bad character, but may be admitted for "other purposes, such as ... identity...." This court has set out a two-step process for reviewing the admission of evidence under Rule 404(b):
 
 
 25
 First, we must decide whether [the evidence] was admissible for any proper purpose, as distinct from the improper purpose of showing "character" or "propensity." If we conclude that there was a proper basis for admission, we must then consider whether the probative value of the evidence outweighed its potential prejudicial effects. In the second instance, the standard of review on appeal is whether the trial judge abused his discretion in admitting the evidence.
 
 
 26
 United States v. Vincent, 681 F.2d 462, 465 (6th Cir.1982) (citations omitted).
 
 
 27
 The evidence concerning defendant's past acts was used to identify him as the speaker on the tape. Defendant cites United States v. Hamilton, 684 F.2d 380, 384 (6th Cir.), cert. denied, 459 U.S. 976 (1982), for the proposition that we must apply a particularly stringent standard when evaluating evidence offered to show "identity." In that case, we held that "[t]o be admissible, the [past] crimes must be so similar as to be a 'signature' of the defendant (a device so unusual or distinctive as to be like a signature)." 684 F.2d at 384. "The modus operandi [must be] sufficiently unique [sic] and the crimes sufficiently similar so as to make the evidence admissible to show identity." Id. at 385. The court upheld the admission of evidence concerning two past attempts to pass off small denomination paper currency as large bills by using the same technique used in the case being tried, namely, pasting the corners of large bills onto small ones. Defendant in the instant case contends that there is no common signature or modus operandi between the acts described on the tape and those to which Fernandez and Northcutt testified. He argues that neither the acts described by those witnesses nor the acts described by the speaker on the tape were unusual enough to identify him.
 
 
 28
 However, the evidence in this case was not used to show modus operandi, but rather to match the history of defendant with that of the speaker on the tape; for instance, Fernandez and Northcutt testified as to defendant's connection to the drug world in Texas, his involvement with Ecstasy, and a drug deal in which he lost $1,000.[6] The distinction is significant. As Wright and Graham explain:
 
 
 29
 [T]he exception for "modus operandi" is ... only one method by which other crimes can prove identity. It is important that courts recognize these different modes so as not to impose requirements, such as distinctive similarity, that apply only to the modus operandi method of identification, on different methods of using other crimes evidence to show identity.
 
 
 30
 22 C. Wright & K. Graham, Federal Practice and Procedure § 5246, at 512 (1978), quoted in United States v. Evans, 848 F.2d 1352, 1360 (5th Cir.1988), reh'g on other grounds, 854 F.2d (1988).
 
 
 31
 Thus, the issue here is whether the testimony concerning defendant's past crimes was probative in identifying him as the speaker on the tape, and, if so, whether the probative value was outweighed by the prejudicial effects of this evidence. Vincent, 681 F.2d 465. Although some of the facts extracted from Fernandez and Northcutt--such as the fact that defendant sold several types of drugs or that he used his own name on the return address--may not by themselves have differentiated defendant from any number of people in the drug business, nonetheless, the aggregation of all of these facts, including the loss of $1,000 in a drug deal, the access to Ecstasy, and the connection in Texas, are probative on the issue of his identity. See Huddleston v. United States, 485 U.S. 681, 685 (1988) ("[S]uch evidence should be admitted if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act.").
 
 
 32
 Furthermore, although we recognize that testimony concerning a defendant's past drug dealings may have a strong prejudicial impact in a trial for drug distribution, we are unable to say that the trial court abused its "broad discretion" in determining that this impact was not outweighed by the probative value of the evidence. See Hamilton, 684 F.2d at 384. Exclusion of such evidence "is necessary 'only where the probative value ... is substantially outweighed by the danger of unfair prejudice.' " United States v. Holloway, 740 F.2d 1373, 1378 (6th Cir.), cert. denied, 469 U.S. 1021 (1984) (citation omitted). The evidence here had high probative value because the government's case largely hinged on linking the statements on the incriminating tape to defendant, and the use of past acts to do so was especially necessary in light of the vigorous defense against attempts to use voice identification expert testimony for this purpose. See United States v. Vance, 871 F.2d 572, 576 (6th Cir.), cert. denied, 493 U.S. 923 (1989) ("An important indication of probative value of evidence is the prosecution's need for the evidence in proving its case.") It is also significant that the district court "blunted" the prejudicial impact of this evidence by giving the jury appropriate cautionary instructions both prior to the Rule 404(b) testimony and during the final jury instructions. Holloway, 740 F.2d at 1377-78. Therefore, we uphold the admission of the testimony concerning defendant's past drug dealings. "[W]hether this court might have reached a different conclusion in a trial de novo is irrelevant if the district court acted within its discretion." Vance, 871 F.2d at 576.
 
 
 33
 C. Cross-Examination of Defendant on Prior Acts; Invocation of Privilege Against Self-Incrimination in Front of the Jury
 
 
 34
 Immediately before defendant took the stand to testify, the defense made a motion in limine to prevent the government from cross-examining him on the prior acts evidence admitted through the testimony of Northcutt, Fernandez, and the San Marcos police officer under Rule 404(b). The defense also requested that if such questions were allowed, they be asked out of the presence of the jury since defendant intended to invoke his Fifth Amendment privilege against self-incrimination. The district court denied these motions.
 
 
 35
 On direct examination, after defendant denied involvement in the acts for which he was being tried, defense counsel asked him: "That statement that you didn't have anything to do with it, Ecstasy, would that always have been true, not going into specifics now, but would you have always in your past made that statement?" Defendant responded: "Maybe not." On cross-examination, defendant was asked several questions about his past involvement with drugs and about the testimony of Fernandez and Northcutt implicating him in past drug dealings. Although he did not invoke the Fifth Amendment by name, defendant refused to answer these questions. He now argues that he was prejudiced by the denial of his motion in limine and by being required to refuse to answer these questions in front of the jury.
 
 
 36
 Defendant maintains that the questions posed to him on cross-examination exceeded the permissible scope of cross-examination under Fed.R.Evid. 611(b), which limits questions generally to "the subject matter of the direct examination and matters affecting the credibility of the witness." However, defendant clearly opened the door for the government's cross-examination on the prior acts when he indicated on direct examination that he may have been involved with Ecstasy in the past. Defendant argues, however, that this testimony was brought out on direct examination only to "soften the sting" of the district court's denial of his motion in limine, and should not be regarded as a waiver of his objection to the court's ruling on his motion in limine.
 
 
 37
 A motion in limine is merely a request for guidance by the court on an evidentiary question. As we stated in United States v. Luce, 713 F.2d 1236 (6th Cir.1983), aff'd, 469 U.S. 38 (1984):
 
 
 38
 The trial court may, within its discretion, provide such guidance by making a preliminary ruling with respect to admissibility. The parties may then consider the court's ruling when formulating their trial strategy. However, we see no reason why the trial court could not change its ruling, for whatever reason, when the evidence is actually offered and objected to at trial. A ruling on a motion in limine is therefore essentially an advisory opinion by the trial court.
 
 
 39
 Id. at 1239 (citations omitted). Therefore, the denial of the motion in limine did not insulate the defense from the adverse results of its trial strategy decision to bring out on direct examination an admission of possible past involvement with Ecstasy.[7] Once defendant testified as to his past involvement with Ecstasy, questions concerning that involvement were not beyond the permissible scope of cross-examination. In addition, defendant's vague answer to the contorted question cried out for clarification. Three of the five cross-examination questions to which defendant objects were attempts to clarify that answer.
 
 
 40
 Even had the questions been beyond the scope of the direct examination, it is difficult to see how defendant could have been prejudiced, since he refused to answer the questions and the trial court did not require him to do so.
 
 
 41
 Defendant also argues that the district court erred in denying his request that the cross-examination questions be asked outside the presence of the jury, asserting that it was prejudicial to have the jury hear the questions and see him refuse to answer them. However, "[a] defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination." United States v. Hearst, 563 F.2d 1331, 1340 (9th Cir.1977), cert. denied, 435 U.S. 1000 (1978); see also Aldridge v. Marshall, 765 F.2d 63, 67 (6th Cir.1985), cert. denied, 474 U.S. 1062 (1986) (" '[A]fter taking the stand, the defendant cannot proceed to answer those questions which reflect favorably upon his innocence and refuse to answer those questions [concerning prior bad acts] which tend to indicate his guilt.' " (citation omitted.)). It would not have been error to require defendant to answer the questions posed during cross-examination, as they were reasonably related to the testimony given during the direct examination. As it turned out, the district court did not require defendant to answer the questions or even invoke the Fifth Amendment by name. Defendant certainly cannot assert that he was unfairly prejudiced by merely having the questions posed.
 
 III.
 
 42
 For the reasons stated above, we affirm the district court's judgment of conviction.
 
 
 
 [1]
 Fed.R.Evid. 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
 
 
 [2]
 Spectrography involves comparing and analyzing graphs, or "voiceprints," produced by an electronic device activated by human voice, which represent unique acoustical characteristics of that voice. Jenkins, 525 F.2d at 827 n. 8
 
 
 [3]
 Dr. Hollien testified that he has used the aural perceptual analysis technique at trials over a dozen times and has never been disqualified from testifying. Although this court has never ruled on this technique, we have said that " 'neither newness nor lack of absolute certainty in a test suffices to render it inadmissible in court. Every new development must have its first day in court.' " Brown, 557 F.2d at 556 (citation omitted)
 
 
 [4]
 Furthermore, when Dr. Hollien testified for the government, it was not clear that defendant would take the stand and provide the jury an opportunity to compare his voice to the tape
 
 
 [5]
 The version of Fed.R.Evid. 404(b) in effect at the time of this trial stated: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 
 
 [6]
 Admittedly, the testimony concerning the use of his return address on packages might be seen as modus operandi evidence
 
 
 [7]
 It should be noted that the motion was made before defendant's direct examination testimony, so the district court was not in a position to know with certainty whether defendant's past acts would be properly within the scope of cross-examination